# *Carney v. Montes*

United States District Court for the District of Connecticut

February 21, 2014, Decided; February 21, 2014, Filed

No. 3:12-cv-00183 (SRU)

**Reporter**
2014 U.S. Dist. LEXIS 21769 *

JOHN J. CARNEY, in his capacity as COURT-APPOINTED RECEIVER for HIGHVIEW POINT PARTNERS, LLC, et al., Plaintiff, v. JUAN S. MONTES, a.k.a. "BLACK," Defendant.

**Prior History:** *Carney v. Lopez, 933 F. Supp. 2d 365, 2013 U.S. Dist. LEXIS 43993 (D. Conn., 2013)*

**Counsel:** [*1] For John J. Carney, In His Capacity As Court-Appointed Receiver other Highview Point Partners, LLC, other Michael Kenwood Group, LLC, other MK Master Investments LP, other MK Investments, LTD., other MK Oil Ventures LLC, other Michael Kenwood Capital Management, LLC, other Michael Kenwood Asset Management, LLC, other MK Energy and Infrastructure, LLC, other MKEI Solar, LP, other MK Automotive, LLC, other MK Technology, LLC, other Michael Kenwood Consulting, LLC, other MK International Advisory Services, LLC, other MKG-Atlantic Investment, LLC, other Michael Kenwood Nuclear Energy, LLC, other Mytcart, LLC, other Tuol, LLC, other MKCM Merger Sub, LLC, other MK Special Opportunity Fund, other MK Venezuela, LTD., other Short Term Liquidity Fund, I, LTD., Plaintiff: Amy E. Vanderwal, Dennis O. Cohen, Francesca M. Harker, James W. Day, Jimmy Fokas, Jonathan B. New, Marc E. Hirschfield, Naima J. Garvin, Robertson D. Beckerlegge, LEAD ATTORNEYS, PRO HAC VICE, Ona Theresa Wang, Philip H. Bieler, LEAD ATTORNEYS, Baker & Hostetler LLP - NY, New York, NY; Jonathan R. Barr, LEAD ATTORNEY, PRO HAC VICE, Baker & Hostetler, LLP - DC, Washington, DC.

For Juan S. Montes, also known as Black, Defendant: [*2] David L. Belt, LEAD ATTORNEY, Hurwitz Sagarin Slossberg & Knuff LLC, Milford, CT; Elliot Greenfield, LEAD ATTORNEY, PRO HAC VICE, Debevoise & Plimpton - NY, New York, NY; Eric J Shames, LEAD ATTORNEY, PRO HAC VICE, Eric J. Shames, Esq., P.C., New York, NY; John P DiManno, LEAD ATTORNEY, McCarter & English LLP-HTFD-CT, Hartford, CT; Matthew E Fishbein, LEAD ATTORNEY, PRO HAC VICE, Debevoise & Plimpton LLP, New York, NY; Michael B Mukasey, LEAD ATTORNEY, PRO HAC VICE, Debevois & Plimpson LLP, New York, NY.

**Judges:** Stefan R. Underhill, United States District Judge.

**Opinion by:** Stefan R. Underhill

## Opinion

### RULING ON MOTION TO DISMISS

This case is ancillary to a Securities and Exchange Commission ("SEC") enforcement proceeding against Francisco Illarramendi ("Illarramendi") for violation of federal securities laws. The United States District Court for the District of Connecticut created a receivership estate and appointed John J. Carney (the "Receiver") as receiver.[1] In this action, the Receiver filed a complaint against Juan S. Montes, a.k.a. "Black" ("Montes"), to recover property for the benefit of the receivership estate. Montes moves to dismiss the complaint, arguing that the Receiver lacks standing to bring: any [*3] claims the receivership entities could not have brought themselves, any claims by the receivership entities for wrongdoing in which the receivership entities participated, fraudulent transfer claims, and any claims related to the Permuta transactions. Further, Montes argues that the Receiver's Permuta-related claims are

---

[1] The receivership entities include: Highview Point Partners; MK Master Investments LP; MK Investments, Ltd.; MK Oil Ventures LLC; the MK Group; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG–Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MK Capital Merger Sub, LLC; MK Special Opportunity Fund; MK Venezuela, Ltd.; and Short Term [*4] Liquidity Fund, I, Ltd.

STEPHEN KINDSETH

time-barred and that the Receiver has failed to state a claim for aiding and abetting breach of fiduciary duty, "money had and received," unjust enrichment, and for a constructive trust or accounting. For the reasons stated below, Montes' motion to dismiss (doc. # 80) is granted in part and denied in part.

## I. Standard of Review

A. Motion to Dismiss for Lack of Subject-Matter Jurisdiction

Under *Rule 12(b)(1) of the Federal Rules of Civil Procedure*, "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)*. The party who seeks to invoke a court's jurisdiction bears the burden of establishing that jurisdiction. *Thompson v. Cnty. of Franklin, 15 F.3d 245, 249 (2d Cir. 1994)* (citing *Warth v. Seldin, 422 U.S. 490, 518, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975))*. To survive a motion brought under *Rule 12(b)(1)*, a plaintiff must allege facts demonstrating that the plaintiff is a proper party to seek judicial resolution of the dispute. *Id.* "When considering a party's standing, we 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Thompson, 15 F.3d at 249* (quoting *Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975))*. If a plaintiff has failed to allege facts supportive of standing, it is within the court's discretion to allow or to require the plaintiff to supply, by amendment to **[*5]** the complaint or by affidavits, further particularized allegations of fact supportive of standing. *Id.*

B. Motion to Dismiss for Failure to State a Claim

A motion to dismiss for failure to state a claim pursuant to *Rule 12(b)(6)* is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)* (quoting *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980))*.

When deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)*.

Under *Twombly,* "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief **[*6]** that is plausible on its face." *550 U.S. at 555, 570*; see also *Iqbal, 556 U.S. at 679* ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly, 550 U.S. at 555* (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability,* and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id. at 556* (quotation marks omitted).

## II. Background[2]

This action is an effort to recover approximately $30.7 million in damages and monies that Illarramendi diverted to Montes in order to sustain a Ponzi scheme. The Receiver alleges that Montes was an "instrumental" part of Illarramendi's scheme, working with him, being paid by him, and funneling assets **[*7]** to him for use in the receivership entities' illegitimate investment activities. Specifically, the Receiver alleges that Montes, a senior pension fund investment manager and official at Petroleos de Venezuela, S.A. ("PDVSA"), received payments directly or indirectly from Illarramendi in exchange for his approval of certain bond-swap and investment transactions between PDVSA's pension funds and receivership entities. These payments, disguised as investments or payments for professional fees, were purportedly nothing more than "bribes" and "kickbacks" that Montes received in exchange for nothing of value to the receivership entities.

A. Juan S. Montes

---

[2] All background information is taken from the Second Amended Complaint, unless otherwise noted.

Montes was the corporate manager of finance, investments, and property insurance at PDVSA and its pension funds, as well as a member of PDVSA's investment committee. Through these positions, he was personally involved in and was responsible for transactions between PDVSA's pension funds and the receivership entities. Over the course of almost five years, Montes regularly communicated with Illarramendi to facilitate those transactions.[3] He also negotiated the payment of bribes for himself and on behalf of other PDVSA officials for approval **[*8]** of bond-swap transactions and PDVSA's pension funds' investments in the MK Funds, a receivership entity. In August 2010, Montes resigned from his positions at PDVSA and the PDVSA pension funds.

B. The Scheme

The scheme, a result of Illarramendi's attempts to cover up a massive trading loss, began at least as early as October 2005. With the complicity of his associates, Illarramendi embarked on an elaborate scheme to hide the "hole" between the real assets held by the funds containing investor monies **[*9]** entrusted to Highview Point Partners, LLP ("HVP Partners") and the liabilities owed as a result of trying to conceal losses. The scheme involved the use of offshore entities and bank accounts and a complex web of transfers, loans, and transactions with numerous persons and entities that were often poorly or falsely documented on the books and records of HVP Partners and related hedge funds. When the entire scheme was revealed, the "hole" amounted to more than $300 million.

Christopher Luth, Francisco Lopez, and Illarramendi formed HVP Partners in 2004, each holding a one-third ownership share.[4] The purpose of HVP Partners was to act as the investment manager of the Offshore Fund, a hedge fund to be nominally based in the Cayman Islands (which, the Receiver alleges, was dominated and controlled by HVP Partners). By January 2006, with over $72 million of assets in the Offshore Fund under the control of HVP Partners, the hedge fund was transformed into a "master-feeder" structure by creating the Master Fund, turning the Offshore Fund into an offshore feeder fund, and creating Highview Point L.P., as a domestic feeder fund. As part of this change in structure, the Master Fund was incorporated **[*10]** in the Cayman Islands in 2006 and power over the fund was handed to HVP Partners.

In October 2005, Illarramendi entered into a failed deal that generated substantial losses. Rather than disclose the losses, Illarramendi decided to conceal them. He transferred proceeds received in the transaction to investors other than the Offshore Fund, in amounts greater than the initial investment to make it appear as if those investors had received profits rather than a loss. This resulted in a cash shortfall that the Offshore Fund absorbed and that was concealed on its books. The shortfall was approximately $5.2 million dollars, or roughly ten percent of the net asset value reported on the Offshore Fund's books.

Illarramendi subsequently directed another entity, GlobeOp, the HVP Funds' administrator, to record entries in the books falsely reflecting that the $5.2 million in funds had been transferred to and invested in Ontime Overseas, Inc. ("Ontime"). Illarramendi could not cover the $5.2 million hole and directed Ontime to transfer $7.4 million to the Offshore **[*11]** Fund to make it appear that the falsely-recorded investment in Ontime was being redeemed.

To fund the transfer to Ontime, Illarramendi transferred $5.5 million from HVP Partners' Wachovia bank account. Illarramendi caused HVP Partners to fund these fraudulent transfers primarily through a loan to HVP Partners from a bank at which an HVP co-founder was a director. Over the next five years, there were a series of additional transactions designed to hide the losses, including transactions involving "off the books" bank accounts and the "Permuta" market.

1. "Off the Books" Bank Accounts

To conceal the hole, Illarramendi engaged in various transactions that were not recorded in the books and records of HVP Partners and MK Capital, including using accounts in the names of shell companies such as

---

[3] In 2004, Illarramendi worked as an independent consultant for PDVSA's United States affiliate. After a brief tenure there, his position was terminated and, along with two partners, Illarramendi formed Highview Point Partners. The Receiver alleges that Illarramendi's reputation at PDVSA was tarnished after his departure and, thus, Illarramendi disguised his financial interactions with PDVSA by using an alternate identity. Montes often used the nickname "Black," when corresponding with Illarramendi; Illarramendi used this nickname in a spreadsheet listing bribe payments made to Montes. In other correspondence, Illarramendi and Montes used the aliases, "Carmelo Luizo" and "Lisandro Cuevas."

[4] Christopher Luth and Francisco Lopez are defendants in another suit filed by the Receiver. See Carney v. Lopez, et al., 03:12-cv-00182 (SRU).

Naproad Finance, S.A. ("Naproad") and HPA, Inc. ("HPA"). Illarramendi also used the shell companies' bank accounts to make transfers and other payments to Montes. The accounts were under the control of Illarramendi and HVP Partners and contained commingled funds from the receivership entities, HVP Funds, and other third parties.

*2. The Permuta Market*

The "permuta market" or "swap market" was a type of [*12] currency exchange market operating in Venezuela that Illarramendi used to engage in a series of transactions with PDVSA in order to further his scheme. The permuta market operated as an unofficial currency exchange market in which parties could buy Venezuelan government bonds in bolivars and sell them in U.S. dollars. Through this market, a person could purchase a bolivar-denominated bond through Venezuelan brokerage firms, swap it for a dollar-denominated bond, and then sell the dollar-denominated bond to receive U.S. currency outside Venezuela. Illarramendi raised dollars from investors and purchased bolivar-denominated securities which were then transferred to PDVSA pension funds. The PDVSA funds, in turn, would exchange these bonds for dollar-denominated bonds at the official exchange rate. Illarramendi would then use an entity to sell the dollar-denominated bonds on the open market. The difference between the "official" currency exchange rate and the unofficial permuta market exchange rate could allow investors to achieve substantial profits. Illarramendi, however, paid most of this profit in bribes and kickbacks to Montes and other middlemen for facilitating the transactions.

*3.* [*13] *Illicit Payments Montes Allegedly Negotiated in Exchange for Approving PDVSA Pension Fund Investments.*

In at least two transactions, the Receiver alleges, Montes negotiated illicit payments for approving PDVSA pension fund investments. In the first, the "Harewood Transaction," Montes and Illarramendi negotiated a deal in which Illarramendi would purchase underperforming securities from the pension funds in exchange for a $100 million investment by the pension funds in the MK Special Opportunity Fund ("SOF"), a receivership entity.[5] The pension fund agreed not to withdraw its investment in SOF for one year, after which Illarramendi promised he would return the pension fund's $100 million investment along with a guaranteed rate of return of 8%. In March 2010, the parties executed the agreement and HVP Partners and another receivership entity, Michael Kenwood Ventures ("MKV"), transferred $10 million and $25 million, respectively, to PDVSA. The shares were then transferred to another receivership entity, the Short Term Liquidity Fund, I, Ltd. ("STLF"). On or around August 4, 2010, STLF redeemed the shares for $18 million, effectively having paid about $17 million dollars in excess of what [*14] the shares were worth. The proceeds of the transaction were paid to principals of the MK Group, not to STLF, MKV, or HVP Partners, the parties that financed the transaction. Five days later, STLF paid $5.5 million to Montes and other PDVSA officials. The Receiver alleges that Montes received this payment in exchange for approving the transaction and that Montes was aware that the MK Funds had paid much more than the actual value of the Harewood shares and understood that the purpose of the transaction was to remove under-performing assets from PDVSA's books in exchange for an inflated purchase price.

In the "Movilway Transfer," the Receiver alleges that Illarramendi caused STLF to transfer over $5 million to Movilway, S.L. ("Movilway"), a Spanish telecommunications company, as a kickback intended for Montes. Moris Beracha, who is a defendant in a related receivership action,[6] stated that this transfer was intended to be an investment in Movilway on [*15] behalf of Montes.

C. Related Proceedings

On March 7, 2011, the United States Attorney for the District of Connecticut filed an information against Illarramendi, charging him with wire fraud, securities fraud, investment adviser fraud, and conspiracy to obstruct justice. Illarramendi pled guilty and acknowledged as part of that plea that he had engaged in a scheme to hide from investors and creditors losses he had incurred in a failed transaction and that he had used money provided by new investors to the HVP Funds to pay out returns he promised to old investors. He also admitted to disregarding corporate formalities

---

[5] In negotiating and executing this transaction, Illarramendi and Montes attempted to conceal their communications by using fictitious names and web-based email accounts to organize the payment of bribes to Montes and other PDVSA officials.

[6] *Carney v. Beracha, et al.,* 03:12-cv-00180 (SRU).

and commingling investments in various HVP funds. On June 14, 2011, the SEC began a civil enforcement action against Illarramendi and others, alleging that they misappropriated investor assets in violation of securities laws. The SEC also sought an order freezing the assets of those defendants and the appointment of a Receiver over those assets. In 2011, U.S. District Court Judge Janet B. Arterton appointed John J. Carney as Receiver over those assets.

### III. Discussion

The Receiver's complaint contains seven counts: Count One [*16] alleges a statutory fraud claim; Count Two alleges unjust enrichment; Counts Three and Four allege participation in and aiding and abetting breach of fiduciary duty; Count Five alleges "money had and received;" Count Six requests the imposition of a constructive trust with respect to the transfers from receivership entities to Montes; and Count Seven requests an accounting of transfers from the receivership entities. Montes moves to dismiss the complaint in its entirety, arguing that the Receiver lacks standing to bring these claims and contesting the sufficiency of the pleadings and the claims asserted therein.

#### A. The Receiver's Standing

It is a basic principle of standing that a party must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*. Generally, a receiver stands in the shoes of the entities in receivership. See *Eberhard v. Marcu, 530 F.3d 122, 132 (2d Cir. 2008)* ("The authority of a receiver is defined by the entity or entities in the receivership . . . . A receiver may commence lawsuits, but stands in the shoes of the corporation and can assert only those [*17] claims which the corporation could have asserted.") (internal quotations omitted; citations omitted). Thus, in order to evaluate the Receiver's standing, I must determine what claims the receivership entities could have asserted against Montes. This is a potentially complex matter in the context of a Ponzi scheme, where the receivership entities themselves are alleged to have been instruments of wrongdoing.

The theory underlying the Receiver's claims is that the receivership entities were under Illarramendi's complete control and dominion as he and his accomplices diverted corporate assets. In this case, the Receiver argues that Montes' receipt of fraudulent transfers and other payments originating from the fraud harmed the receivership entities' business and property. On those grounds, the Receiver argues, he has standing to bring these claims on behalf of the receivership entities. Like many defendants in similar receivership actions, Montes challenges the Receiver's standing to bring this action. Montes' motion to dismiss for lack of standing is based on four arguments: (1) the *Wagoner* rule bars the Receiver's claims; (2) the Receiver may not assert claims that the receivership entities [*18] could not have asserted themselves; (3) the Receiver lacks standing to bring the fraudulent transfer claim because the receivership entities are not creditors; and (4) the Receiver lacks standing to bring any cause of action related to the Permuta transactions because the receivership entities were not harmed. I will address each argument in turn, although there is substantial overlap among them.

*1. The Wagoner Rule*

The Second Circuit's so-called "*Wagoner* rule" provides that, "when a bankrupt corporation has joined with a third party in defrauding its creditors," the bankruptcy trustee for that corporation lacks standing "to recover against the third party for the damage to the creditors." *Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991)*. It is similar to the affirmative defense of *in pari delicto,* but rather than functioning as an affirmative defense, in the Second Circuit it is a prudential standing limitation. See *In re Optimal, 813 F. Supp. 2d 383, 395 (S.D.N.Y. 2011)*. "The rationale underlying the *Wagoner* rule derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to [*19] the corporation . . . . Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Wight v. BankAmerica Corp., 219 F.3d 79, 86-87 (2d Cir. 2000)* (citations omitted).

In *Wagoner,* a bankruptcy trustee brought an adversary proceeding against the debtor's broker for his alleged churning of the debtor's account. The debtor was himself accused of selling worthless notes and loan agreements to members of his church and using the proceeds to make stock trades on behalf of his wholly-owned corporation, which subsequently went bankrupt. The trustee of the corporation brought suit against the

brokerage house where the debtor had been trading, alleging that the broker allowed the debtor to use its facilities to trade with highly leveraged funds in exchange for high commissions and for churning the corporation's accounts. The Second Circuit held that the trustee lacked standing to bring a claim on behalf of the corporation because the corporation had joined with the brokerage house in defrauding its creditors. *Wagoner, 944 F.2d at 119-20*.

The **[*20]** central question here is whether the *Wagoner* rule bars the claims brought by the Receiver. The Receiver argues that "an equity receiver is a creature of equity and the appointing court [and] is generally not imputed with the wrongdoing of the insolvent corporate entities he or she represents." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 13. Setting forth the approach adopted by many courts,[7] the Seventh Circuit Court of Appeals has held that a receiver for corporations dominated by a Ponzi scheme principal had standing to assert fraudulent transfer claims against third parties because the receiver was acting on behalf of corporations that were instrumentalities in that scheme. *Scholes v. Lehmann, 56 F.3d 750 (1995)*. In *Scholes,* the individual perpetuating a Ponzi scheme used corporations he created to transfer funds rightly belonging to those corporations to other entities. A receiver for those corporations brought a fraudulent conveyance action against third parties to recover amounts transferred by the corporations. The *Scholes* Court held that the receiver had standing to bring the fraudulent transfer claims—even though the corporations he represented were nominally involved in the **[*21]** wrongdoing—and declined to impute the corporation's bad acts to the receiver because to do otherwise would allow the "wrongdoer . . . to profit from his wrong." *Scholes, 56 F.3d at 754*. Writing for the court, Judge Richard A. Posner reasoned that:

> [t]he appointment of the receiver removed the wrongdoer from the scene. The corporations were no more [the Ponzi principal's] evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit not of [the Ponzi principal] but of innocent investors—that [the Ponzi principal] had made the corporations divert to unauthorized purposes . . . . Now that the corporations created and initially controlled by [the Ponzi principal] are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by [the Ponzi principal]. We cannot see any legal objection and we particularly cannot see any practical objection.

*Id. at 754-55*. The Receiver argues that this court, like many outside this Circuit, should follow the Seventh Circuit's reasoning, **[*22]** rather than expanding the *Wagoner* rule to cover receivers. Montes, in response, argues that the Second Circuit does not recognize *Scholes* and cites cases in the Second Circuit where a district court applied the *Wagoner* rule in holding that a receiver lacked standing to bring certain claims on behalf of entities involved in fraudulent schemes. *See, e.g., Cobalt Multifamily Investors I, LLC v. Shapiro, 2008 U.S. Dist. LEXIS 25849, 2008 WL 833237, at *4 (S.D.N.Y. Mar. 28, 2008)*.

Citing *Eberhard,* Montes argues that a receiver who does not represent a creditor lacks standing to bring a fraudulent conveyance claim. *Eberhard* is important—and Montes is careful in his reliance on it—because it is the only Second Circuit **[*23]** case to opine on the applicability of *Scholes.*[8] In *Eberhard,* the receiver

---

[7] *See, e.g., Janvey v. Democratic Senatorial Campaign Committee, Inc., 712 F.3d 185, 192 (5th Cir. 2013); Wing v. Dockstader, 482 F. App'x 361, 363 (10th Cir. 2012); Grant Thornton, LLP v. Federal Deposit Ins. Corp., 435 F. App'x 188, 201 (4th Cir. 2011); Donell v. Kowell, 533 F.3d 762, 770-78 (9th Cir. 2008); Warfield v. Byron, 436 F.3d 551, 558 (6th Cir. 2006); Hodgson v. Kottke Assocs., LLC., 2007 U.S. Dist. LEXIS 56205, 2007 WL 2234525, at *7 (E.D. Pa. Aug. 1, 2007); Goldberg v. Chong, 2007 U.S. Dist. LEXIS 49980, 2007 WL 2028792, at *10 (S.D. Fla. July 11, 2007)*.

[8] Without citing *Eberhard* or *Scholes,* the Second Circuit recently addressed the issue of a SIPA trustee's standing in *In re Bernard L. Madoff Inv. Securities LLC., 721 F.3d 54 (2d Cir. 2013)* ("*Madoff*"). The Court held that the *Wagoner* **[*24]** rule and the doctrine of *in pari delicto* applied to bar a SIPA trustee's common law claims brought on behalf of the debtor and the debtor's customers. *Id. at 64* & n.13 (trustee "stands in the shoes of BLMIS and may not assert claims against third parties for participating in a fraud that BLMIS orchestrated"; "The pleadings here leave us with no doubt that BLMIS—in whose shoes the Trustee stands—bore at least "substantially equal responsibility" for the injuries the Trustee now seeks to redress.") (citation omitted). That decision does not apply here, where the Receiver has been appointed to bring claims on behalf of receivership entities that do not bear "substantially equal responsibility" for the injuries the Receiver seeks to redress. In short, *Madoff* represents a straightforward application of the *Wagoner* rule and the present case

represented only the transferor of assets, that is, the individual who allegedly engaged in fraudulent conveyances. The Second Circuit held that the receiver lacked standing to bring fraudulent conveyance claims on the individual's behalf because it would allow him to avoid the consequences of his actions. *Eberhard,* however, relied on *Scholes* and a subsequent Seventh Circuit case, *Troelstrup v. Index Futures Group, Inc., 130 F.3d 1274 (7th Cir. 1997)*, to distinguish between situations in which the receiver seeks to bring claims on behalf of a creditor of a transferor and those in which the receiver brings claims on behalf of a transferor for whom he was not appointed to bring claims. See *Eberhard, 530 F.3d at 132-34*. The *Eberhard* Court's denial of standing to the receiver was limited to the second situation—where the receiver seeks to bring claims on behalf of the transferor himself.

Expressly endorsing the Seventh Circuit's analysis in *Scholes,* the *Eberhard* Court held that "a receiver's standing to bring a fraudulent conveyance claim will turn on whether [the receiver] represents the transferor only or also represents a creditor of the transferor." *Id. at 133*; see also *id. at 131 n.11* [*25] (if the corporate entities "had remained within the estate and established creditor status, the Receiver would have represented a creditor of [the transferor], and as in *Scholes,* would have met the standing requirement"). Importantly, in *Eberhard,* the Second Circuit adopted the reasoning of *Scholes* that when transfers are made by corporations that are completely controlled by the wrongdoer, "the transfers were, in essence, coerced." *Id. at 132*. The corporation then becomes the creditor in the coerced transaction and a receiver for the coerced corporation has standing to claw back the transfers. Here, as I explain below, the fraudulent transfer claims are brought on behalf of receivership entities, which are creditors of the transferor, Illarramendi. Accordingly, under the *Eberhard* decision, the Receiver has standing to bring claims against Montes.

In three other cases, courts in the Second Circuit have allowed receivers to bring fraudulent transfer claims, notwithstanding the *Wagoner* rule. In *Federal Nat. Mortg. Ass'n v. Olympia Mortg. Corp., 2011 U.S. Dist. LEXIS 63669, 2011 WL 2414685 (E.D.N.Y. June 8, 2011)*, the district court discussed the relationship between *Eberhard* and *Scholes* and, in part, adopted *Scholes*' [*26] reasoning. In that case, the receiver brought claims to recover funds fraudulently conveyed from a corporation that had engaged in wrongdoing. The

___

represents a straightforward application of *Eberhard.*

court held that,

> [s]ince the wrongdoer in such a scenario is not the corporation proper, but rather the management which conveyed away the corporation's assets to the corporation's detriment . . . [the corporation's] receiver has standing to pursue a fraudulent conveyance claim against the[] defendants.

*2011 U.S. Dist. LEXIS 63669, [WL] at *7*. Similarly, in *Friedman v. Wahrsager, 848 F. Supp. 2d 278, 289-90 (E.D.N.Y. 2012)*, the defendants argued that the receiver's fraudulent conveyance claims against them should be dismissed because the receiver could only bring a cause of action that could be brought on behalf of a creditor or related "shell entities" and that the creditor in that action was the receivership entity that made the fraudulent conveyance. The district court, citing both *Eberhard* and *Scholes,* held that the receiver could bring its claims to the extent that "defendant's arguments . . . mirror[] the same arguments raised in *Scholes.*" *Id. at 290*. Likewise, in *Armstrong v. Collins, 2010 U.S. Dist. LEXIS 28075, 2010 WL 1141158, at *33 (S.D.N.Y. Mar. 24, 2010)*, reconsid. denied, *2011 U.S. Dist. LEXIS 8764, 2011 WL 308260 (S.D.N.Y. Jan. 31, 2011)*, [*27] the court, citing *Scholes,* held that receivers bringing suit on behalf of creditors created by a Ponzi principal to perpetuate his fraud had standing to assert fraudulent transfer claims.

In opposition to these cases, Montes cites *Cobalt,* in which a district court held that the receiver's position was "sufficiently analogous to a bankruptcy trustee as to be subject to the standing limitations set forth in *Wagoner* and its progeny." *Cobalt, 2008 U.S. Dist. LEXIS 25849, 2008 WL 833237, at *3* (citing *Scholes*). Montes also cites *AKRO Investicni Spolecnost, A.S. v. A.B. Watley Inc., 2003 U.S. Dist. LEXIS 3478, 2003 WL 1108135, at *7 (S.D.N.Y. Mar. 12, 2003)*. The Receiver argues that defendant's reliance on *AKRO* "is misplaced because the court found that the receiver lacked standing on other grounds" and that the *Cobalt* Court noted a "viable argument that the *Wagoner* rule's standing limitations may not be applicable to the Receiver." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 21 n.16. Both of these statements are incorrect. The *AKRO* decision held that the receiver lacked standing because the *Wagoner* rule applied and the receiver failed to establish the adverse interest exception to the *in pari delicto* doctrine. *Cobalt* only noted that the magistrate [*28] judge's report, to which plaintiff objected, observed a "viable argument" that the *Wagoner* rule may not apply in that case because the receiver "may be judicially authorized in appropriate cases to pursue

claims on behalf of the investors in the defunct corporation." *Cobalt, 2008 U.S. Dist. LEXIS 25849, [WL] at \*3 n.7*.

Although the Receiver's attempts to distinguish *Cobalt* fail, there is a significant distinction between this case and that one. Nothing in the *Cobalt* decision indicates that the corporations were effectively coerced by dominating wrongdoers. Thus, there were no allegations that permitted the receiver in *Cobalt* to argue that the corporations were creditors of the true wrongdoers and therefore that the receiver had standing to bring claims. And, importantly, both *Cobalt* and *AKRO* were decided before *Eberhard,* so the judges in those cases did not have the guidance from the Second Circuit as contained in *Eberhard.*

In sum, the *Eberhard* Court adopted *Scholes,* thereby establishing an exception to the *Wagoner* rule. In the Second Circuit, when transfers are made by a corporation that is dominated by the wrongdoer, a receiver appointed to recover assets for the receivership entity—rather than for a wrongdoer who [*29] manipulated the dominated entity—has standing to bring claims on the corporation's behalf. *See Eberhard, 530 F.3d at 132-34*. Accordingly, I hold that, consistent with *Eberhard* and *Scholes*, the Receiver has standing to bring a statutory fraudulent conveyance claim (including a CUFTA claim) on behalf of any receivership entity that was acting merely as the instrumentality of Illarramendi's wrongdoing, which includes each of the receivership entities. Next, I address whether the doctrine of *in pari delicto* bars the Receiver's claims.

2. In Pari Delicto Doctrine

Although the *Wagoner* rule, as modified by *Eberhard,* does not deprive the Receiver of standing to bring his fraudulent conveyance claims, I must also address whether the *in pari delicto* doctrine applies to the Receiver's claims. It is a "basic principle of agency . . . that the acts of a corporation's agents are attributed to the corporation itself." *Harp v. King, 266 Conn. 747, 777-78, 835 A.2d 953 (Conn. 2003)*. The doctrine of *in pari delicto* provides that actions brought on illegal or corrupt bargains must fail if the plaintiff has been a significant participant in the subject wrongdoing, bearing at least equal responsibility for the violations [*30] he seeks to redress. *In re Flanagan, 415 B.R. 29 (D. Conn. 2009)*. Montes argues that Illarramendi's conduct is properly imputed to the receivership entities because the Receiver has alleged that Illarramendi controlled them. Montes also argues that the Receiver cannot bring a CUFTA claim against him because, under agency principles, the Receiver represents entities that engaged in wrongdoing and, thus, the *in pari delicto* doctrine applies.

The imputation principles embodied in the various exceptions and counter-exceptions to the *in pari delicto* doctrine each seek to ensure that a wrongdoer does not stand to profit from his bad acts and that the parties harmed are able to recover, notwithstanding a wrongdoer's abuse of agency relationships. Thus, the Receiver's invocation of the adverse interest exception to *in pari delicto,* and Montes' use of the total abandonment and sole actor rules as counters to the adverse interest exception, though they reach the same result as both *Scholes* and *Eberhard,* are unnecessary.[9]

---

[9] The adverse interest exception provides that the misconduct of the management of a corporation will not be imputed to the corporation if the officer acted in his own interest and adverse to the interest of the corporation. *See Cobalt, 857 F. Supp. 2d 419, 431-32* (*in pari delicto* does [*32] not apply if the fraud was not perpetrated for the benefit of the debtor corporation but only for the benefit of the wrongdoer). Montes cites cases limiting the application of the adverse interest exception to cases where the management has "totally abandoned" the corporation's interest. *See, e.g., Breeden v. Kirkpatrick & Lockhart LLP, 336 F.3d 94, 100 (2d Cir. 2003)*; *In re The Mediators, Inc., 105 F.3d 822 (2d Cir. 1997)*. Because the Permuta transactions benefitted the receivership entities, Montes argues, Illarramendi did not "totally abandon" the corporations' interests and, therefore, the adverse interest exception does not apply. Further, Montes argues that the application of the adverse interest exception is barred by the "sole actor" rule, which applies where the corporation gives its agent total control over the corporation or when the principal and agent are alter egos. *See, e.g., Breeden, 336 F.3d at 100*; *In re The Mediators, Inc., 105 F.3d at 827* (sole actor rule "imputes agent's knowledge to the principal notwithstanding agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal"). Accordingly, Montes [*33] argues, because the Receiver alleges that Illarramendi had "unfettered control" over the receivership entities or was an alter ego of the receivership entities, the sole actor rule applies.

The cases Montes cites apply New York law. Connecticut law interprets the adverse interest exception more broadly. *See Cobalt, 857 F. Supp. 2d 419, 431-32*. Under Connecticut law, courts "do not consider an extension of the corporation's life as a result of fraud to be a material 'benefit' sufficient to preclude it from coming within the adverse interest exception to the *in pari delicto* defense." *Id. at 431*. The Receiver argues

As stated above, the *Wagoner* rule elevates the doctrine of *in pari delicto* to a prudential standing limitation. See *In re Optimal, 813 F. Supp. 2d 383, 395 (S.D.N.Y. 2011)*. Thus, [*31] the discussion above concerning the applicability of the *Wagoner* rule to the Receiver's standing applies with equal force to Montes' *in pari delicto* affirmative defense. Notwithstanding the doctrine of *in pari delicto,* the Second Circuit has applied the Seventh Circuit's holding in *Scholes* to allow receivers to bring claims on behalf of receivership entities involved in a Ponzi scheme. *Eberhard, 530 F.3d at 132-34*. The Receiver has been appointed to recover property of the receivership entities. Whether Illarramendi acted adversely to the interests of the receivership entities, or whether he "totally abandoned" the interests of the organizations or acted alone in carrying out his bad acts, does not bar the Receiver's claims; the Receiver has been appointed to bring claims on behalf of the receivership entities, and Illarramendi, the wrongdoer, will not benefit from the recovery of receivership property.

3. Whether the Receiver is a "Creditor" for Purposes of the Fraudulent Transfer Claim

CUFTA *section 52-552e(a)(1)* provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor":

> [If] the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred [*34] the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor. . . .

*Conn. Gen. Stat. § 52-552e(a)(1)*. Thus, in order to have standing to bring a claim under CUFTA, a claimant must have been a creditor at the time the alleged fraudulent transfer took place. *Chien v. Skystar Bio Pharm. Co., 623 F. Supp. 2d 255, 267 (D. Conn. 2009)*.

Montes argues that the Receiver has failed to state a statutory fraud claim because: (1) only the receivership entities' creditors have standing to bring such claims; (2) the receivership entities are not creditors of each other; (3) the receivership entities are not "tort creditors" of Illarramendi; and (4) the receivership order does not confer standing on the Receiver to bring claims that the receivership entities could not have brought themselves.

It is true that only the receivership entities' creditors have standing to bring the CUFTA claim. It is also true that a receivership appointment order, as Montes argues, "does not give the Receiver carte blanche to bring claims that would otherwise be barred." See *Eberhard, 530 F.3d at 134* ("[F]ederal law does not give a receiver, or a district court, the authority to re-write [*35] or ignore state law."). Regarding the other two of Montes' assertions, the Receiver offers two arguments in response. First, the Receiver argues that the receivership entities are "tort creditors" with respect to the money Illarramendi and Montes stole because the fraudulent transfers harmed the receivership entities. Montes argues that under the "tort creditor" theory, Illarramendi is the debtor. Under CUFTA, only property of the debtor qualifies as an asset that may be recovered and the Receiver seeks to recover payments that were property of the receivership entities. Thus, Montes argues that the fraudulent transfer claims are invalid.

The line of cases following *Scholes, see supra,* supports the argument that receivership entities have standing to bring UFTA claims. For example, in *Armstrong v. Collins, 2010 U.S. Dist. LEXIS 28075, 2010 WL 1141158, at *33 (S.D.N.Y. Mar. 24, 2010)*, the receiver brought fraudulent transfer claims on behalf of receivership entities that were used in perpetrating a Ponzi scheme. The court, citing *Scholes,* held that similarly-situated entities were UFTA creditors and thus had standing to bring suit. *Id. at *33*. Citing the same line of cases, the Receiver also argues that the alter [*36] ego allegations do not preclude the receivership entities' creditor status. As the Receiver notes, *Scholes* stated, "the fact the corporations were alter egos of [defendant] would not affect the receiver's standing to bring [] fraudulent conveyance suits. The corporations existed and were abused." *56 F.3d at 758*. Montes' attempt to use what amounts to a reverse-veil-piercing theory to void any obligations incurred among the receivership entities is ultimately unavailing. The allegation that the receivership entities were alter egos of Illarramendi is irrelevant where a receiver has been appointed to bring claims on behalf of those entities. That Illarramendi coerced the entities into making fraudulent transfers does not strip the Receiver of the ability to recover those transfers, whether a receivership entity is a creditor of the wrongdoer or another receivership entity in a transfer, or whether a receivership entity is a creditor in a transfer to a third-

---

that Illarramendi committed the fraud solely for his benefit and that of certain insiders, and that any benefit to the receivership entities as a result of the Permuta transactions only served to prolong the receivership entities' lives.

party debtor. In either event, the Receiver here is a "creditor" for purposes of the fraudulent transfer claim.

*4. Whether the Receiver May Bring Causes of Action Related to the Permuta Transactions.*

It is fundamental that in order [*37] to have standing, a plaintiff must have suffered an "injury in fact." *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. Montes argues that the Receiver lacks standing to bring any cause of action related to the Permuta transactions because the receivership entities profited from them and, thus, were not harmed. Montes' theory is that the transfers allegedly paid to him were made in exchange for PDVSA's participation in the Permuta transactions, which ultimately benefitted the receivership entities. Thus, the bribes were part of a transaction that provided a benefit to the receivership entities rather than independent fraudulent transfers causing them harm. Def.'s Mem. in Supp. of Mot. to Dismiss at 21-22. In *Reider v. Arthur Andersen, LLP, 47 Conn. Supp. 202, 212, 784 A.2d 464 (Super. Ct. 2001)*, the court rejected a similar argument, holding that the only benefit derived from the artificial prolongation of the life of the purportedly "benefited" entity inured to the benefit of the persons looting it. *See also Schacht v. Brown, 711 F.2d 1343, 1348 (7th Cir.)*, cert. denied, 464 U.S. 1002, 104 S. Ct. 508, 104 S. Ct. 509, 78 L. Ed. 2d 698 (1983). The Receiver argues that the fraudulent payments, in the context of a Ponzi scheme, were harmful [*38] to the receivership entities because they deprived the receivership entities of $30 million and the new investments, rather than benefitting the receivership entities, "served only to prop up the Ponzi scheme so that Illarramendi and Montes could continue to loot them." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 12. I agree. And although the Permuta transactions may have generated gains, it would be a strange rule that because one portion of a Ponzi scheme might have profited an entity at some point in time, any assets connected to that portion of the Ponzi scheme are beyond the reach of creditors seeking to recover fraudulent transfers. Such a rule would effectively preclude any fraudulent conveyance actions in the Ponzi scheme context. There is a more fundamental argument, however. Profit—or the absence of a transaction "loss"— is not equivalent to the absence of harm. An entity may profit from a transaction and yet be harmed by having failed to receive the full amount of profit due. In that sense, bribes paid to Montes constitute harm to the entities rather than a price paid to earn profits. Accordingly, I conclude that the Receiver has standing to bring the statutory fraud claims [*39] based on the Permuta transactions.

B. Counts Two and Five: Unjust Enrichment and "Money Had and Received"

The Receiver seeks to recover under a theory of unjust enrichment against Montes for his receipt of money from the receivership entities "in the form of payments and bribes and other [transfers]." Am. Compl. at ¶ 128. A plaintiff seeking recovery for unjust enrichment must prove: (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment. *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282-83, 649 A.2d 518 (1994)*.

The Receiver also seeks to recover "money had and received." An action for "money had and received" is similar to an action for unjust enrichment. *See Gold v. Rowland, 296 Conn. 186, 202 n.15, 994 A.2d 106 (2010)* ("[M]oney had and received . . . is the equivalent of the more modern action for unjust enrichment."). Both are equitable actions that allow a party to recover a benefit conferred on a defendant. *See Mendelsohn v. BidCactus, LLC, 2012 U.S. Dist. LEXIS 42625, 2012 WL 1059702 (D. Conn. Mar. 28, 2012)*. To meet the elements of a claim for money had and received, the plaintiff [*40] must demonstrate that the defendant received money belonging to the plaintiff, and benefitted from receipt of that money. *SV Special Situations Master Fund Ltd. v. Knight Libertas, LLC, 2011 U.S. Dist. LEXIS 73608, 2011 WL 2680832 (D. Conn. July 8, 2011)* (citing *Koch v. Stop & Shop Co., Inc., 2003 Conn. Super. LEXIS 371, 2003 WL 553280 (Conn. Super. Ct. Feb. 11, 2003))*.

Montes, citing an unreported Connecticut Superior Court case, *Bridgeways Comm'ns Corp. v. Time Warner, Inc., 1998 Conn. Super. LEXIS 2488, 1998 WL 638444, at *9 (Conn. Super. Ct. Sept. 4, 1998)*, argues that the Receiver has failed to state a claim for unjust enrichment because the complaint includes no factual allegation that Montes actually benefited from the transactions. That case is inapposite. There, the court dismissed the defendants' counterclaim for unjust enrichment not simply because the plaintiff failed to allege an actual benefit, but also because the defendant alleged that the benefit at the core of the unjust enrichment claim arose out of the plaintiffs' institution of the lawsuit.

Montes also argues that the claim for money had and received fails with respect to the Movilway and Harewood transactions because the Receiver has not alleged that Montes actually received any payments from either [*41] of those transfers. I need not address the Movilway transfer; although the Receiver alleges that a transfer was made to Movilway for Montes' benefit, the Receiver does not seek to avoid the transfer and has only used that transfer as evidence of Montes' and Illarramendi's relationship. *See* Am. Compl. at ¶ 107 ("This payment to Movilway is not included among the Transfers that the Receiver is seeking to avoid in this Action."). Thus, there is no claim to dismiss with respect to the Movilway transaction.

With respect to the Harewood transfer, the Receiver has alleged that a payment was made, upon information and belief, to benefit Montes. Am. Compl. at ¶ 101 ("On or around August 9, 2010, approximately $5.5 million in bribe payments were made from STLF and, upon information and belief, intended to pay PDVSA officials, including Montes."). The Receiver has also alleged that Montes negotiated a ten percent kickback for his participation in the transfer. *Id.* at ¶¶ 102-04. The Receiver admits, however, that he has not alleged that Montes actually received any payments from the Harewood transfer. Instead, the Receiver states that he "has alleged the known facts based on his investigation to [*42] date" and that discovery will likely uncover more facts. Pl.'s Mem. in Opp'n to Mot. to Dismiss at 37.

It is a close question but, in light of the complexity of the scheme and the equitable nature of actions for unjust enrichment and "money had and received," the motion to dismiss these equitable claims fails. Although he has not clearly alleged that Montes received money in the Harewood transfer, the Receiver has alleged that Montes was not entitled to these payments, and that he received these benefits at the expense of the receivership entities. Accordingly, I deny Montes' motion to dismiss the Receiver's claims for unjust enrichment and for "money had and received."

C. Counts Three and Four: Aiding and Abetting Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege that: "(1) the [*43] party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Efthimiou v. Smith, 268 Conn. 499, 505, 846 A.2d 222 (2004)* (quoting *Halberstam v. Welch, 705 F.2d 472, 477, 227 U.S. App. D.C. 167 (D.C. Cir. 1983))*; accord *Palmieri v. Lee, 1999 Conn. Super. LEXIS 3201, 1999 WL 1126317, at \*4 (Conn. Super. Ct. Nov. 24, 1999)*.

The Receiver alleges that Illarramendi had a duty of care and loyalty to HVP Partners and the MK Entities and duties to act in good faith. Illarramendi also had the duty, the Receiver argues, not to waste or divert the assets of the receivership entities and the duty not to act in furtherance of his interests at the expense of HVP Partners and the MK Entities. The Receiver alleges that Montes "knowingly, or with reckless indifference, aided and abetted Illarramendi by furnishing indispensable assets and counter-parties necessary to engage in transactions which provided cover for Illarramendi's fraudulent activities." Am. Compl. at ¶ 135. Count Four alleges that Montes and Illarramendi [*44] "willfully and knowingly conspired to breach Illarramendi's fiduciary duties." *Id.* at ¶ 148. In furtherance of the conspiracy, the Receiver contends, Montes extracted bribes and other payments from the MK Funds and the HVP Funds.

Montes argues that the Receiver has failed to state a claim for breach of fiduciary duty because the complaint does not plausibly allege that Montes had any knowledge of the existence of fiduciary duties Illarramendi owed to the receivership entities, "much less that Montes aided and abetted or conspired with Illarramendi's breach of those duties." Def.'s Rep. Mem. in Supp. of Mot to Dismiss at 2. The Receiver need only allege that Montes was "generally aware" of his role as part of an overall illegal or tortious activity. The complaint alleges that: (1) Montes received bribes in exchange for his participation in the Permuta transactions and knew or was recklessly indifferent to Illarramendi's breach of fiduciary duty (*see* Am. Compl. at ¶¶ 77-83); (2) Montes and Illarramendi communicated using pseudonyms and special email addresses to disguise their actions (*id.* at ¶ 104); and (3) Montes received a kickback in exchange for participation in the Harewood transaction [*45] and knew that Illarramendi breached his fiduciary when he overpaid for the Harewood shares and bribed the PDVSA officials (*id.* at ¶ 103). Although it strains credulity to believe that Montes was unaware that Illarramendi was breaching a fiduciary duty to the receivership entities, the Receiver has not alleged that Montes was aware of Illarramendi's fiduciary duties to the receivership entities or that the payments came from the receivership entities rather than Illarramendi himself, and has cited no case for the

STEPHEN KINDSETH

proposition that the payment of bribes is enough to establish one's participation in a breach of fiduciary duty. Accordingly, I dismiss the Receiver's breach of fiduciary duty-related claims; because these defects in pleading may be curable, the dismissal is without prejudice to the filing of a further amended complaint within 30 days.

D. Counts Six: Constructive Trust

The Receiver requests the imposition of a constructive trust with respect to the transfer of funds, assets, or property from receivership entities as well as to any profits received by the defendants in the past or in the future in connection with the receivership entities. A constructive trust is a remedy, it **[*46]** does not give rise to an independent substantive cause of action. *Titan Real Estate Ventures, LLC v. MJCC Realty Ltd. P'ship., 415 B.R. 29, 44 (D. Conn. 2009)* (citing *Macomber v. Travelers Prop. & Cas. Corp., 261 Conn. 620, 623 n.3, 804 A.2d 180 (2002))*. I may consider whether to impose a constructive trust as a remedy after the Receiver has established Montes' liability. Thus, I dismiss the claim for a constructive trust and convert it to a request for remedy.

E. Count Seven: Accounting

The Receiver requests an accounting of any transfer of funds, assets, or property received from the receivership entities as well as to any past and future profits in connection with the receivership entities. Montes argues that a request for an accounting is a remedy, not a substantive cause of action, relying on a Connecticut Supreme Court case, *Macomber v. Travelers Prop. & Cas. Corp., 261 Conn. 620, 804 A.2d 180 (2002)*. The Receiver responds that an accounting is a recognized action under Connecticut law and that there is no appellate authority clarifying the *Macomber* footnote. Additionally, the Receiver argues that a request for an accounting is a cause of action where "the facts create a reasonable doubt whether adequate **[*47]** relief may be obtained at law." Pl.'s Mem. in Opp'n to Mot. to Dismiss at 49 (citing *Mankert v. Elmatco Prods., Inc., 84 Conn. App. 456, 460, 854 A.2d 766 (2004))*. I need not resolve the question whether an accounting is a valid cause of action. As I did with respect to the constructive trust claim, I dismiss the claim for an accounting and convert it to a request for remedy.

F. Statute of Limitations

A court may dismiss on statute of limitations grounds where facts supporting a statute of limitations defense are set forth in papers filed by plaintiff himself. *Walters v. Indus. & Commercial Bank of China, 651 F.3d 280, 293 (2d Cir. 2011)*. The original complaint was filed on February 3, 2012 and the first amended complaint was filed on July 11, 2012. The second amended complaint was filed August 31, 2012. Montes seek to dismiss all or part of each claim pursuant to statutes of limitations.

*1. Count One: Actual Fraud (Conn. Gen. Stat. § 52-552e(a)(1))*

Montes seek to dismiss all claims related to the Permuta transactions because they accrued more than four years before this lawsuit was commenced. The Receiver invokes the discovery rule of *sections 52-552e(a)(1)* and *52-552j* of CUFTA and argues that the applicable **[*48]** statute of limitations is one year from the appointment of the Receiver. Under the so-called "discovery rule" of *section 52-552e(a)(1)*, an action is timely if brought within one year of the date on which the fraud could reasonably have been discovered by the claimant. See *Epperson v. Entm't Express, Inc., 338 F. Supp. 2d 328, 344 (D. Conn. 2004)*, aff'd sub nom. *Epperson v. Entm't Exp., Inc., 159 F. App'x 249 (2d Cir. 2005)*. The Receiver brought his actual fraud claim on February 2, 2012, within one year of the Receiver's appointment on February 3, 2011. Thus, the Receiver's actual fraud claim under CUFTA is timely.

Montes argues that, because Illarramendi's knowledge of the alleged transfers is imputed to the receivership entities as of the time that the transfers were made, the discovery period applicable to the fraudulent transfer claims is one year after the alleged payments were made. In *Armstrong v. McAlpin, 699 F.2d 79, 89 (2d Cir. 1983)*, the Second Circuit held that a receiver's claims were time barred because the shareholders of a corporation accused of securities fraud, "with reasonable diligence," could have discovered the fraudulent conveyance within the statute of limitations. **[*49]** The Receiver, however, could not have discovered the wrongdoing until he was appointed. And insofar as the corporations were used to carry out the alleged bad acts, the only person in a position to discover the bad acts was a person involved in perpetrating them. Montes concedes that there is no clear authority from Connecticut courts on this issue. Accordingly, I am charged with predicting what the Connecticut Supreme Court would do, and I hold that the discovery period renewed upon the appointment of the Receiver.

### 2. Counts Two and Five: Unjust Enrichment and "Money Had and Received"

The Receiver correctly argues that Count Two, the unjust enrichment claim, is not subject to the three-year statute of limitations because it is equitable in nature and, thus, the court need not adhere to statutes of limitation. *See Rossman v. Morasco, 115 Conn. App. 234, 256, 974 A.2d 1 (2009)* ("Although courts in equitable proceedings often look by analogy to the statute of limitations to determine whether, in the interests of justice, a particular action should be heard, they are by no means obliged to adhere to those time limitations.") (citations omitted). Accordingly, I will not dismiss the unjust enrichment **[*50]** claims, and will apply a three-year statute of limitations to the "money had and received" claims here.

### 3. Counts Six and Seven: Constructive Trust and Accounting

To the extent a constructive trust is a remedy imposed under a court's equitable powers, an action for a constructive trust has no statute of limitations. *See Cendant Corp., 474 F. Supp. 2d at 383*. Similarly, to the extent that I treat the action for an accounting as a remedy, it has no statute of limitations. Thus, the Receiver's requests for imposition of a constructive trust and an accounting are timely.

### V. Conclusion

For the reasons stated above, I grant in part and deny in part Montes' motion to dismiss (doc. # 80). I grant without prejudice defendant's motion to dismiss Counts Three (Participation in and Aiding and Abetting Breach of Fiduciary Duty) and Four (Conspiracy to Breach Fiduciary Duty) and convert Counts Six (Constructive Trust) and Seven (Accounting) to remedies. I deny defendant's motion to dismiss Count One (Actual Fraud (*CUFTA § 52-552e(a)(1)*), Count Two (Unjust Enrichment), and Count Five (Money Had and Received).

It is so ordered.

Dated at Bridgeport, Connecticut, this 21st day of February 2014.

/s/ Stefan R. Underhill **[*51]**

Stefan R. Underhill

United States District Judge

---

**End of Document**

STEPHEN KINDSETH