# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 3:17-cv-00155-VAB |
| MARK J. VARACCHI and | ) |
| SENTINEL GROWTH FUND | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants, | ) |
| and | ) |
| | ) |
| RADAR ALTERNATIVE FUND LP and | ) |
| RADAR ALTERNATIVE MASTER FUND SPC, | ) |
| | ) |
| Relief Defendants. | ) |

## FIFTH INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS

I.    SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED ...................... 3
    A.    Discounts ................................................................................................. 6
    B.    Fee Schedules ........................................................................................... 6
    C.    Activity Categories .................................................................................... 7
II.    SUMMARY OF CASH ON HAND ............................................................................ 8
III.    SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE .......................... 9
    A.    The Receiver's Website and Investor Contact ................................................ 9
    B.    The Fourth Quarterly Status Report ........................................................... 10
    C.    Marshaling of Receivership Assets and Receipt of Assets by Receiver ......................... 10
    D.    Claims Administration and Plan of Distribution ............................................. 12
    E.    Litigation - TAM Action ........................................................................... 16
    F.    Litigation - Sarroff Action ....................................................................... 18
    G.    Kostiner Settlement .................................................................................. 19
    H.    Investigation into Weeden Prime Services, LLC ............................................ 21
    I.    Litigation - Rajo Action ........................................................................... 23
    J.    Investigation into and Demand upon Ralph Giorgio ..................................... 24
    K.    Investigation into Kizzang, LLC .................................................................. 25
    L.    Investigation into Entourage Funding, LLC ................................................ 29
    M.    Investigation of Other Private Investments ................................................. 31
    N.    Actual and Anticipated Disbursement of Assets ........................................... 32
    O.    Anticipated Closure ................................................................................. 35
IV.    DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE ................................ 35
V.    THE COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES .............. 36
    A.    The Governing Legal Standard ................................................................. 36
    B.    Application of the Governing Legal Standard to the Application .................. 37
    C.    Source and Manner of Payment ................................................................ 38

**FIFTH INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES
INCURRED BY THE RECEIVER AND HIS PROFESSIONALS**

Jed Horwitt, Esq. (the "Receiver"), as the Receiver appointed by this Court in the above-captioned action (the "Receivership Proceeding") commenced by the Securities and Exchange Commission (the "SEC" or "Commission"), by and through his undersigned counsel, and Zeisler & Zeisler, P.C. ("Z&Z"), as counsel for the Receiver, pursuant to this Court's Order Appointing Receiver entered May 1, 2017 (ECF No. 12, the "Receivership Order") and Order Reappointing Receiver (ECF No. 47, the "Reappointment Order", and together with the Receivership Order, the "Receivership Orders") entered February 14, 2018, respectfully submits this fifth interim application (the "Application") for professional fees and expenses incurred by the Receiver and Z&Z[1], on behalf of the Receivership Estate (as defined in the Receivership Orders), during the period commencing April 1, 2018, through and including June 30, 2018 (the "Compensation Period"). In advance of filing, the Receiver shared this Application with counsel for the Commission, and the Commission's counsel has stated that the Commission has no objection to the approval of the professional fees and expenses requested herein.

In support of this Application, the Receiver and Z&Z respectfully represent as follows:

**I.     SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED**

1.     This Application has been prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the

---

[1] Due to the tax busy season and the medical issues of the senior partner responsible for this case, the Receiver's accountant and financial advisor, Verdolino & Lowey, P.C. ("V&L") was unable to provide their quarterly invoices for the prior compensation period (January 1, 2018 – March 31, 2018) before the deadline for filing the Fourth Quarterly Fee Application. Prior to the filing of this Application, V&L was again unable to provide its invoices for Compensation Period to Z&Z due to a death in the family of the senior partner responsible for this case. V&L anticipates seeking approval of their fees and expenses for the period covering January 1, 2018 through and including June 30, 2018 in the next quarterly fee application.

"SEC Guidelines") and the Receivership Orders.

2.      Pursuant to the SEC Guidelines, the following exhibits are attached to this Application:

a.      The completed Standardized Fund Accounting Report ("SFAR"), in the form prescribed by the SEC Guidelines, and certified by Receiver, is attached hereto as Exhibit A;

b.      A Certification of Compliance with the SEC Guidelines by the Receiver and Z&Z is attached hereto as Exhibit B;

c.      A summary of total expenses for which reimbursement is requested for Z&Z is attached hereto as Exhibit C;

d.      Time records summarizing the work performed by the Receiver and his legal professionals and paraprofessionals for each of their Activity Categories (as hereinafter defined) are attached hereto as Exhibits D-1; D-2, D-3, D-4, D-5; D-7, D-8, D-9, D-10, and D-11.[2]

3.      The Receiver and Z&Z attorneys and paraprofessionals have expended a total of 643.4 hours working on this matter during the Compensation Period. The Receiver and Z&Z seek allowance of compensation of services rendered during the Compensation Period on behalf of the Receivership Estate in the amount of $176,584.60, and reimbursement of actual and necessary expenses in the amount of $3,948.92.

4.      The Receiver and Z&Z acknowledge that their fee compensation is subject to a twenty percent (20%) holdback, pursuant to the SEC Guidelines and the Receivership Orders.

5.      The fees assessed reflect the hours worked by the Receiver, Z&Z attorneys and paraprofessionals and the hourly rates applicable at the time that they rendered their services, as

---

[2] Because their contents include privileged and confidential material, protected attorney work-product, and other sensitive information describing, *inter alia*, the Receiver's strategy in this Receivership Proceeding, and pursuant to the Court's Order entered August 11, 2017 (ECF No. 25), Exs. D-1 through D-11 are filed under seal. Furthermore, the Receiver and Z&Z have intentionally omitted time records from their Activity Category Six (Application for Professional Fees and Expenses), because they are not requesting compensation for services performed under this Activity Category.

modified by the significant discounts provided by the Receiver and Z&Z (described below).

6.     These amounts also take into account all relevant circumstances and factors as set forth in the Connecticut Rules of Professional Conduct and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the professionals and paraprofessional working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver under the Receivership Orders.

7.     A narrative description of the particular services provided by the Receiver and Z&Z's attorneys and paraprofessionals is included in the time records attached as Ex. D-1 through D-11. Section III below summarizes the Receiver's administration of the Receivership Estate since his appointment.

8.     Z&Z's expense reimbursements requested are modest and principally consist in the following: (i) PACER charges for accessing electronic documents in the numerous federal litigations relevant to the Receivership Proceeding; (ii) shipping charges; (iii) expenses associated with the Receiver's website; (iv) fees for service of subpoenas and complaints; (v) filing fees incurred in litigation on behalf of the Receivership Estate; (vi) photocopying; (vi) long distance travel expenses; and (vii) online legal research. (*See* Ex. C.)

9.     The Receiver and Z&Z have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime. Nor have the Receiver or Z&Z requested reimbursement for any meals during the Compensation Period.

10.     The Receiver and Z&Z have complied with the SEC Guidelines' internal

photocopying rates as follows: $0.15 per page for black and white and $1.00 per page for color copies.

### A.   Discounts

11.     As proposed by the Receiver as part of his application for selection as receiver submitted to the Commission, and as provided in the Receivership Orders, the Receiver and Z&Z have consented to and implemented substantial public service discounts with respect to their billing rates for services provided in this Receivership Proceeding.

12.     More specifically, and as shown in the fee schedules set forth below, Z&Z has consented to 20% public service discounts to its regularly applicable hourly rates for all legal professionals and paraprofessionals.

13.     The Receiver originally agreed to discount his generally applicable hourly rate for services provided when serving primarily in his capacity as Receiver to $250 per hour, reflecting a 50% discount. Notwithstanding, as an additional discount, despite the fact that many of the services provided by the Receiver during the Compensation Period were mostly legal in nature, the Receiver and Z&Z have voluntarily applied the much more deeply discounted $250 hourly pay rate to all of the Receiver's time during this period.

### B.   Fee Schedules

14.     The fee schedule for the Receiver, showing: his name; the hourly rate applied to his services in this Receivership Proceeding and his customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his services during the Compensation Period; is as follows:

| Receiver | Rate (Cust. Rate) | Rate Discount | Hours | Amount Billed | Amount Discounted |
|---|---|---|---|---|---|
| Horwitt, Jed | $250 ($500) | $250 | 7.7 | $1,925 | $1,925 |

15.     The fee schedule for all Z&Z legal professionals who provided services during the Compensation Period, showing for each: his or her name; the hourly rate applied to his or her services in this Receivership Proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period; is as follows:

| Legal Professional | Rate (Cust. Rate) | Rate Discount | Hours | Amount Billed | Amount Discounted |
|---|---|---|---|---|---|
| Blau, Christopher | $220 ($275) | $55 | 8 | $1,760 | $440 |
| Kindseth, Stephen | $340 ($425) | $85 | 126.4 | $42,976 | $10,744 |
| Romney, Aaron | $320 ($400) | $80 | 132.2 | $42,304 | $10,576 |
| Vaughan, Rion | $240 ($300) | $60 | 364.9 | $87,576 | $21,894 |

16.     The fee schedule for the legal paraprofessional who provided services during the Compensation Period, showing: his or her name; the hourly rate applied to his or  her services in this Receivership Proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period; is as follows:

| Legal Paraprofessional | Rate (Cust. Rate) | Rate Discount | Hours | Amount Billed | Amount Discounted |
|---|---|---|---|---|---|
| Joseph, Kristin | $148 ($185) | $37 | 4.2 | $621.60 | $155.40 |

**C.     Activity Categories**

17.     Pursuant to the SEC Guidelines, the Receiver and Z&Z have utilized the following activity categories (each an "Activity Category," and, collectively, the "Activity Categories")

7

under which the following fees have been incurred during the Compensation Period:

<u>Activity Categories Utilized by Receiver and Legal Professionals</u>

a.      Category One: Case Administration, 74.2 hours, $21,039 (*see* Ex. D-1);

b.      Category Two: Asset Analysis & Recovery, 75 hours, $18,628 (*see* Ex. D-2);

c.      Category Three: Asset Disposition, 0 hours, $0.00 (*see* Ex. D-3);

d.      Category Four: Business Operations, 0 hours, $0.00 (*see* Ex. D-4);

e.      Category Five: Claims Administration & Objections, 115.4 hours, $31,048 (*see* Ex. D-5);

f.      Category Six: Application for Professional Fees and Expenses, the Receiver and Z&Z are not including time incurred for these services in their Application (*see* Ex. D-6);

g.      Category Seven: Litigation – Taran Asset Management, 53.9 hours, $13,935 (*see* Ex. D-7); and

h.      Category Eight: Litigation – A. L. Sarroff Management, 210.7 hours, $60,734.60 (*see* Ex. D-8).

i.      Category Nine: Litigation – Shay Kostiner, 13.5 hours, $3,852 (*see* Ex. D-9).

j.      Category Ten: Litigation – Weeden Prime Services, 83.8 hours, $22,606 (*see* Ex. D-10).

k.      Category Eleven: Litigation – Rajo Corp., 16.9 hours, $4,742 (*see* Ex. D-11).

## II.    <u>SUMMARY OF CASH ON HAND</u>

18.     The Receiver's cash on hand is held in the Receivership Account (as hereinafter defined), the balance of which, as of June 30, 2018, is $2,163,862.33. This constitutes a decrease of $132,914.50 during the Compensation Period. (*See* Ex. A.)

III.    **SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE**

19.    During the Compensation Period, the Receiver diligently exercised his duties pursuant to the terms of the Receivership Orders and made significant progress in marshalling and liquidating Receivership Assets for distribution to the holders of Claims against the Receivership Estate. Items of particular investigation and analysis by the Receiver and his professionals, as discussed below, were drafting his *Motion for Entry of an Order Approving and Authorizing the Receiver's Proposed (i) Pooling Assets and Liabilities of Receivership Entities (ii) Allowance of Certain Claims, (iii) Plan of Distribution, and (iv) Related Relief* (ECF No. 62, the "Motion to Approve Plan of Distribution"), investigating and developing causes of action against certain Private Investments, related broker-dealers, and insiders of the Receivership Entities, and continuing to litigate previously commenced causes of action held by the Receivership Estate against third parties.

20.    Utilizing Z&Z as his legal professionals, the Receiver has undertaken the following on behalf of the Receivership Estate:

A.    **The Receiver's Website and Investor Contact**

21.    At all times during the Compensation Period, the Receiver has maintained a website – http://jedhorwittreceiver.com – that has provided information to the public concerning the Receivership Proceeding, in addition to the more particular notices provided to parties-in-interest.

22.    The website states who the Receiver is and describes his role, provides access to filings in the Receivership Proceeding, and contains contact information such that interested parties may contact Z&Z attorneys by e-mail or telephone with questions, concerns or information.

23.    Z&Z's professionals, on behalf of the Receiver, have fielded and effectively responded to inquiries from investors in order to ensure that they are educated concerning the

Receivership Proceeding and the claims management procedures discussed herein.

  **B.**  **The Fourth Quarterly Status Report**

  24.  The Receiver and Z&Z also prepared and, on April 30, 2018, filed the Fourth Quarterly Status Report. ECF No. 56. In drafting the Fourth Quarterly Status Report, the Receiver and Z&Z compiled comprehensive information to update the Court, the Commission and all other parties-in-interest as to the Receiver's operations, the Receivership Estate's assets, the status of various litigation and Claims against the Receivership Estate.

  **C.**  **Marshaling of Receivership Assets and Receipt of Assets by Receiver**

  25.  Shortly after his appointment, pursuant to the Receivership Order, the Receiver opened an account at a financial institution experienced in servicing court-appointed receivers (and bankruptcy trustees), which account (the "Receivership Account") will hold funds marshaled by the Receiver and will constitute Receivership Assets.

  26.  Pursuant to the Court's orders, the Receiver and Z&Z previously undertook to assume control and possession over the funds held in certain frozen accounts and to transfer them to the Receivership Account.

  27.  During the Compensation Period, the Receivership Account accrued interest at a rate of 0.33% monthly, amounting to total interest payments of $1,846.76 for the Compensation Period.

  28.  Prior to the Compensation Period, Z&Z attorneys uncovered deposits held in Citibank brokerage accounts by Sentinel on behalf of entities that used the brokerage accounts to trade on Sentinel's IPO platform (the "Citibank IPO Accounts"). Citibank required balances of at least $10,000.00 in each of these accounts in order to maintain the ability to trade through Citibank. After Z&Z attorneys verified that the funds for these deposits came directly from Sentinel's

operating account, Z&Z attorneys notified Citibank of the Freeze Order and the Receivership Orders, and requested documentation relevant to determining the nature, scope, and extent of the Receivership Estate's interest in the Citibank IPO Accounts.

29.     As of the Receiver's discovery of the Citibank IPO Accounts in early February 2018, only five (5) of the Citibank IPO Accounts had positive balances, totaling approximately $50,000. The three (3) remaining Citibank IPO Accounts had been emptied at different points following February 2, 2017 (the "Contempt Accounts"). Z&Z attorneys requested further documentation regarding the Contempt Accounts from Citibank, and Citibank complied.

30.     After reviewing the documents produced by Citibank regarding the Contempt Accounts, Z&Z attorneys determined that the persons who completely withdrew the balances from the Contempt Accounts (the "Potential Contemnors") had actual or constructive notice of the Freeze Order and the Receivership Order.

31.     Accordingly, prior to the Compensation Period, Z&Z attorneys drafted and served letters to the Potential Contemnors demanding the immediate return of the funds withdrawn from the Contempt Accounts.

32.     During the Compensation Period, the Potential Contemnors contacted Z&Z attorneys to resolve the Receiver's demands.

33.     Z&Z attorneys determined that two of the Potential Contemnors (Prague Capital Management, LLC and Alton Bay Capital, LLC) were "New Creditors" holding potential Claims against the Receivership Estate of approximately $260,000.

34.     Z&Z attorneys negotiated settlements of his demand against these Potential Contemnors in exchange for the release of their Claims plus the return of $11,000 in funds withdrawn from the Contempt Accounts.

11

35.     The third Potential Contemnor, Taran Capital US Fund LP ("Taran Capital"), is controlled by Christopher Gleason, one of the defendants in the TAM Action discussed in Section III. E. below. During the Compensation Period, the Receiver and Z&Z attorneys, in consultation with the Commission, evaluated financial information provided by Gleason in connection with the TAM Action and concluded that, although Taran Capital likely had notice of the Freeze Order, bringing a separate motion for contempt in the SEC Action was not in the best interest of the Receivership Estate at this time.

### D.     Claims Administration and Plan of Distribution

36.     Prior to the Compensation Period, the Receiver and Z&Z drafted a comprehensive set of procedures to permit parties with claims against the Receivership Estate to submit them for an orderly evaluation and processing. To this end, the Receiver filed the Claims Procedure Motion on July 27, 2017, which included, *inter alia*, (i) the establishment of a deadline for submitting such claims to the Receiver, (ii) the form and manner of notice of the claims procedures (the "Claims Notice"), (iii) the form and manner for the submission of such claims by investors and other creditors, and (iv) the procedure for the adjudication of disputed claims (ECF No, 23, the "Claims Procedure Motion").

37.     On July 31, 2017, the Court entered its Order Approving Claims Procedure (ECF No. 24, the "Claims Procedure Order") granting the relief requested in the Claims Procedure Motion and approving the Claims Notice in the form requested by the Receiver.

38.     Following the entry of the Court's Reappoint Order, on February 21, 2018, this Court entered an order on the docket providing:

> There is a pending motion to supplement claims procedure on the docket. ECF No. 35. Since the filing of that motion, the Receiver has been reappointed. ECF No. 47. To the extent that the Receiver continues to seek relief, the Receiver is directed to renew its motion to supplement claims procedure in light of the more recent ruling.

ECF No. 49.

39.     In compliance with this Court's direction, the Receiver drafted and, on March 12, 2018, filed his Renewed Supplemental Claims Procedure Motion, renewing his request for the relief initially outlined in the Supplemental Claims Procedure Motion. ECF No. 52.

40.     On April 2, 2018, the Court entered its Order Approving the Renewed Supplemental Claims Procedure (ECF No. 53, the "Supplemental Claims Procedure Order" and, together with the Claims Procedure Order, the "Claims Procedure Orders").

41.     The Supplemental Claims Procedure Order affirmed the original bar date of September 27, 2017 and set June 1, 2018 at 5:00 p.m. as the second bar date applicable to New Creditors.

42.     During the Compensation Period, Z&Z attorneys contacted the New Creditors to provide them with notice of their potential Claims and the procedure for asserting such Claims against the Receivership Estate.

43.     Despite having provided such notice, the Receiver did not receive any additional proofs of Claim prior to the expiration of the second bar date.

44.     Both bar dates for the submission of Claims have now passed. In total, the Receiver received thirty-three (33) Claims aggregating in excess of $32 million.

45.     The Receiver believes that the Claims administration process has reached the threshold where a plan providing for the *pro rata* distribution and other related relief would be

appropriate for the Court's consideration and approval.

46.     As set forth in **Exhibit A** and **Exhibit B** to the Motion to Approve Plan of Distribution, the Receiver has resolved twenty-seven (27) Claims (the "Resolved Claims"), has proposed the allowance of 26 Claims[3] totaling approximately $18 million (the "Proposed Allowed Claims"), and has identified six (6) Claims, totaling approximately $9 million, which may require a formal objection pursuant to the Claims Procedure Orders (the "Remaining Disputed Claims").

47.     During the Compensation Period, and in consultation with the Commission, the Receiver and Z&Z attorneys finalized the proposed procedure through which the Proposed Allowed Claims would be allowed, an initial distribution could be made, and other related issues could be addressed by this Court.

48.     In developing this proposed procedure, the Receiver considered and applied the legal and equitable principles articulated in various precedent established by other recent Commission receiverships appointed for the benefit of victims of Ponzi schemes as well as analogous judicial decisions in this Second Circuit.

49.     Based on the foregoing along with other appropriate considerations, the Receiver filed his Motion to Approve Plan of Distribution on July 12, 2018, which requests this Court approve the following:

a.  The pooling of assets of the Receivership Entities and the *pro rata* distribution to the holders of Allowed Claims, as discussed in greater detail in **Section IV** of the Motion to Approve Plan of Distribution;

b.  The application of the legal and equitable principles and "Claims Calculation Methodology"[4] applied by the Receiver in evaluating and determining the

---

[3] As set forth in **Exhibit A** and **Exhibit B** to the Motion to Approve Plan of Distribution, four (4) submitted investor Claims were consolidated into two (2) Proposed Allowed Claims pursuant to the Claims Calculation Method and three (3) Claims were withdrawn by the Claimant at the request of the Receiver.

[4] The Receiver's Fourth Quarterly Status Report previously characterized the Claims Calculation Method as the "Net Investment Method". *See* ECF No. 56 at fn.2. Although there are significant overlaps in the Claims Calculation Method and the Net Investment Method in their application to determining the amount

timely filed Claims, as described in **Section V** of the Motion to Approve Plan of Distribution;

c.   The allowance of certain Claims in the amounts proposed by the Receiver as set forth in **Exhibit A** submitted with the Motion to Approve Plan of Distribution;

d.   The classification and treatment of Allowed Claims as set forth in **Section VI. A.** of the Motion to Approve Plan of Distribution;

e.   The interim distribution of $3,100,000 in Receivership Assets to holders of Allowed Claims in accordance with Rising Tide Method (defined and described below) to the Creditors and in the amounts as set forth in **Exhibit C** (the "Proposed Interim Distribution") and **Section VI. B-C.** of the Motion to Approve Plan of Distribution;

f.   The distribution procedures governing the Proposed Interim Distribution and future interim distributions, as set forth in **Section VI. D.** of the Motion to Approve Plan of Distribution; and,

g.   The establishment of a Reserve Account as provided for in **Section VI. E.** of the Motion to Approve Plan of Distribution.

50.    This summary is for informational purposes only. The Receiver encourages all parties-in-interest to review the Motion to Approve Plan of Distribution and its accompanying exhibits as the relief requested therein may affect their legal and equitable rights. To that end, the Receiver served copies of the Motion to Approve Plan of Distribution and its exhibits on all affected parties. Likewise, copies are available free of charge at www.jedhorwittreceiver.com. Responses to the Motion to Approve Plan of Distribution are due by August 2, 2018.

51.    Although the Motion to Approve Plan of Distribution was not presented to the Court during the Compensation Period, the Receiver has included it in this Application as the bulk of the related work was completed during the Compensation Period.

---

of a given Claim against a receivership estate, the Receiver has determined that use of the term "Net Investment Method" was ambiguous because the "Net Investment Method" is often used to encompass both the method of calculating Claims and the method for making a distribution on account of Claims calculated using the Net Investment Method. As discussed in greater detail in Section VI. B-C of the Motion to Approve Plan of Distribution, the Receiver has determined that the Rising Tide Method *of distribution* is more equitable than the Net Investment Method of distribution in the present case. Accordingly, the Receiver has adopted the term "Claims Calculation Method" in the Motion to Approve Plan of Distribution in order to avoid any confusion with the Net Investment Method of distribution.

E.     **Litigation - TAM Action**

52.     During the Compensation Period, the Receiver and Z&Z continued to prosecute their lawsuit, *Jed Horwitt Esq., Receiver v. Taran Asset Management, LLC et al.*, (Civil Action No.: 3:17-cv-01840-VLB) (the "TAM Action"), against Taran Asset Management, LLC ("TAM"), Christopher Gleason ("Gleason"), and Baseline Advisors, LLC ("Baseline" and, collectively, the "TAM Defendants") in the United States District Court for the District of Connecticut.

53.     The TAM Action originally sought to recover pursuant to the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §§ 52-552 *et seq.* ("CUFTA"), approximately $1.4 million that Varacchi caused Sentinel to pay allegedly to or for the benefit of the TAM Defendants.

54.     Prior to the Compensation Period, Z&Z attorneys uncovered that Varacchi had caused Sentinel to pay certain debts incurred by TAM prior to Sentinel's existence and at a time when Varacchi was TAM's Chief Operating Officer. In total, from October 15, 2013, through November 30, 2016, Varacchi, in furtherance of his Ponzi scheme, used assets of the Receivership Entities or caused Sentinel make a series of transfers to such creditors of TAM for the benefit of TAM and/or Gleason in the aggregate amount of $390,279.88 (the "TAM Debt Transfers").

55.     During the Compensation Period, Z&Z attorneys investigated the TAM Debt Transfers to the TAM-Related Entities and began to draft a third amended complaint to avoid such transfers under CUFTA.

56.     In the course of settlement negotiations with counsel to the TAM Defendants, Z&Z attorneys informed counsel for the TAM Defendants of the Receivership's claims related to the TAM Debt Transfers. At the request of counsel to the TAM Defendants, Z&Z attorneys agreed to postpone filing an amended complaint until June 15, 2018, while the parties attempted to reach a settlement.

57.     In the course of settlement negotiations, the TAM Defendants produced substantial amounts of TAM's and Gleason's financial records to Z&Z attorneys in an effort to demonstrate that collection of a judgment against these parties was unlikely and impractical.

58.     As part of this production, TAM and Gleason provided Z&Z attorneys with bank records which demonstrated how the proceeds of the settlement payment Varacchi caused Sentinel to pay to TAM were disbursed to TAM's and Gleason's creditors.

59.     Z&Z attorneys traced approximately $730,000 of the settlement payment proceeds (the "Subsequent Transfers") to just three parties – Edmond Tschan, Rachael Taxman, and Myron Taxman (together, the "Subsequent Transferee Defendants") – each of whom the Receiver has reason to believe did not receive the Subsequent Transfers in good faith.

60.     Accordingly, on June 15, 2018, Z&Z attorneys filed a motion to amend the complaint to (i) to add allegations to existing causes of action to recover an additional $390,279.88 in TAM Debt Transfers, and (ii) to assert a new cause of action against and to join the Subsequent Transferee Defendants as defendants based on their status as subsequent transferees pursuant to CUFTA §§ 52-552(b)(i) and (h)(a)(i) (ECF No. 40, the "Motion to Amend").

61.     In total, the Motion to Amend and the attached third amended complaint ("Third Amended Complaint") increases the total amount claimed in the TAM Action to $1,860,029.

62.     As a result of the Receivership's filing of the Motion to Amend, counsel for the TAM Defendants informed the Court that the settlement conference previously scheduled for July 17, 2018 would not be productive and the Court cancelled the settlement conference.

63.     On July 26, 2018, the Court entered its order granting the relief requested in the Motion to Amend. ECF No. 45.

64.     On August 1, 2018, Z&Z attorneys filed the Third Amended Complaint. ECF No.

47.

65.     On August 2, 2018, the Court issued its summons on the Subsequent Transferee Defendants.

66.     As of the filing of this Application, Z&Z attorneys have engaged process servers to serve the Subsequent Transferee Defendants with the Third Amended Complaint in accordance with the Federal Rules of Civil Procedure.

**F.     Litigation - Sarroff Action**

67.     During the Compensation Period, the Receiver and Z&Z continued to prosecute their lawsuit, *Jed Horwitt Esq., Receiver v. Alan Sarroff et al.*, (Civil Action No.: 3:17-cv-01902-VLB) (the "Sarroff Action") against Alan L. Sarroff ("Sarroff") and A.L. Sarroff Management, LLC ("Sarroff, LLC", and collectively, the "Sarroff Defendants"), in the United States District Court for the District of Connecticut, at Hartford (Bryant, J., presiding). The Sarroff Action seeks to recover pursuant to CUFTA over $14 million that Varacchi caused Sentinel to pay to or for the benefit of the Sarroff Defendants.

68.     The parties filed their joint 26(f) report in the Sarroff Action on April 20, 2018. ECF No. 32.

69.     During the Compensation Period, the Receiver engaged in significant motion practice relating to the Sarroff Defendants' challenge to the legal sufficiency of the Receiver's Complaint filed in the Sarroff Action.

70.     On March 31, 2018, the Sarroff Defendants filed a motion to dismiss the Sarroff Action asserting that the Complaint fails to state a claim for which relief can be granted. (ECF No. 25, the "Motion to Dismiss").

71.     The Receiver's response in opposition to the Sarroff Defendants' Motion to

Dismiss was filed on April 20, 2018 (ECF No. 31, the "Opposition Response").

72.     On May 11, 2018, the Sarroff Defendants filed with reply to the Opposition Response (ECF No. 45, the "Sarroff Defendants' Reply").

73.     Also on May 11, 2018, the Receiver served the Sarroff Defendants with his first set of Interrogatories and Requests for Production (the "Receiver's IRP").

74.     After receiving leave of this Court, the Receiver filed his sur-reply to the Sarroff Defendants' Reply on May 25, 2018 (ECF No. 45, the "Sur-Reply").

75.     Generally speaking, the issues briefed in the Motion to Dismiss and related filings fall into two categories: (i) whether a plaintiff seeking to avoid a fraudulent transfer under § 52-552e(a)(1) of CUFTA must plead that the transferee received the voidable transfer with fraudulent intent, and (ii) whether, in the context of a Ponzi scheme, the return of a transferee's principal is unavoidable as a matter of law.

76.     On June 7, 2018, Judge Bryant entered an order reassigning the case to this Court. ECF No. 47.

77.     As of the date of this Application, this Court has not ruled on the Motion to Dismiss.

78.     During the Compensation Period, Z&Z attorneys also worked with counsel to the Sarroff Defendants to narrow the scope of the Receiver's IRP in order to make the parties' scheduled settlement conference as productive as possible. Z&Z attorneys also prepared a memorandum regarding the Sarroff Action for the judge presiding over the settlement conference.

79.     As of the date of this Application, the settlement conference is scheduled for September 27, 2018.

**G.     Kostiner Settlement**

80.     Prior to the Compensation Period, Z&Z attorneys negotiated the settlement of

causes of action that the Receiver believes he may hold against Shay Kostiner ("Kostiner"). In 2013, Kostiner was the largest initial participant in the multi-manager trading platform then offered by Varacchi through Sentinel and Radar LP. From September 24, 2013, through November 7, 2013, Kostiner deposited a total of $5.7 million onto the platform. From November 18, 2013, through April 1, 2014, Varacchi caused Sentinel to make a series of transfers to Kostiner in the aggregate amount of $7,142,082 (collectively, the "Kostiner Transfers"). The amount received by Kostiner in excess of his original principal deposits, specifically, $1,442,082, represents the "net profits" realized by Kostiner through the trading platform.

81.    Prior to the Compensation Period, Kostiner, his counsel and Z&Z attorneys met in person to discuss the possibility of settlement. Kostiner presented various facts and circumstances in his effort to establish his good faith in his participation in the Sentinel platform and receipt of the Kostiner Transfers from Sentinel. Based upon this and the Receiver's independent investigation, the Receiver and Kostiner agreed, subject to this Court's approval, to settle the Receiver's claims in exchange for Kostiner's return to the Receivership Estate of the full amount of net profits Kostiner received in the total amount of $1,442,082. The parties negotiated and drafted the terms and conditions of their settlement into a written agreement (the "Kostiner Settlement Agreement") which does not include any admission of wrongdoing by Kostiner.

82.    On April 30, 2018, both parties executed the Kostiner Settlement Agreement.

83.    During the Compensation Period, Z&Z attorneys drafted the motion to approve the Kostiner Settlement Agreement (ECF No. 57, the "Motion to Approve"), and filed it with the Court on May 3, 2018.

84.    On May 8, 2018, in order to preserve the parties' rights while the Motion to Approve was pending before the Court, the Receiver and Kostiner executed a tolling agreement

which provided, in relevant part, that:

> Any and all applicable statutes and periods of limitations and other lapse of time based claims and/or defenses, legal or equitable, which Kostiner might otherwise be or become entitled to assert with respect to the Claims including, without limitation, any and all agreements, statutes, regulations, and other rules of law which may limit the period in which the Receiver may commence a civil action or other proceeding asserting any Claims (all of the above, collectively, the "Timing Defenses") against Kostiner shall be, and hereby are, tolled, suspended, and extended through July 14, 2018 (the "Extended Limitation Date").

85.    On May 22, 2018, the Court granted the Motion to Approve and entered an order approving the Kostiner Settlement Agreement. (ECF No. 61, the "Order Approving Kostiner Settlement".)

86.    According to the terms of the Kostiner Settlement Agreement, Kostiner shall make payment of $1,442,082 to the Receiver within ten (10) days of the Order Approving Kostiner Settlement becoming a "Final Order" as that term is defined in the Kostiner Settlement Agreement. A "Final Order" is defined in the Kostiner Settlement Agreement as

> an order that has not been reversed, vacated, stayed, modified, or amended and as to which (i) the time to appeal or petition for review or certiorari has expired and as to which no appeal or petition for review or certiorari is pending, or (ii) any appeal or petition for review or certiorari has been finally decided or dismissed and no further appeal or petition for review or certiorari can be taken or granted.

⁋ 5, ECF No. 57-1.

87.    On July 22, 2018, after the Compensation Period, the Order Approving Kostiner Settlement became a Final Order.

88.    On July 26, 2018, in compliance with the Kostiner Settlement Agreement and the Order Approving Kostiner Settlement, Kostiner wired $1,442,082 to the Receivership Account.

**H.    Investigation into Weeden Prime Services, LLC**

89.    During the Compensation Period, the Receiver and Z&Z attorneys continued their investigation into potential causes of action against Weeden Prime Services, LLC ("Weeden").

90.     Shortly after his appointment, the Commission provided the Receiver with information provided by Weeden and other parties to the Commission during its investigation into the Receivership Entities (the "SEC Data").

91.     During the Compensation Period, the Receiver, together with Z&Z attorneys and V&L, explored the cost and benefits of various alternatives for managing the SEC Data – including the use of Z&Z's and V&L's internal data management infrastructures.

92.     Ultimately, the Receiver determined that the cost of a third-party vendor was reasonably likely to produce a net economic benefit to the Receivership Estate. After consulting with the Commission, the Receiver engaged Empire Discovery as a third-party e-discovery vendor to assist with managing the SEC Data.

93.     Consistent with the SEC Guidelines, the Receiver shall request reimbursement only for the amount billed by Empire Discovery and paid by the Receiver to Empire Discovery. As of the filing of this Application, Empire Discovery had not billed the Receiver for services provided during the Compensation Period, nor had the Receiver paid any amount to Empire Discovery for its services provided during the Compensation Period.

94.     Specifically, Z&Z attorneys reviewed the SEC Data to investigate Weeden's role in the Ponzi scheme Varacchi perpetuated through the Receivership Entities, whether Weeden had any knowledge of Varacchi's scheme or was otherwise on notice of any "red flags" which should have prompted Weeden's further inquiry into the Receivership Entities, and whether Weeden engaged in any actionable conduct.

95.     The Receiver's investigation of these and other claims against Weeden is in the ongoing. The Receiver is not in a position at this time to report on such claims or predict the likelihood or extent of any recovery. The Receiver will not only have to assess the legal merits of

any such claims but will also have to make a practical evaluation of the potential benefit to the Receivership Estate weighed against the cost of pursuing each claim.

96.     In the event that the Receiver determines that it is in the best interest of the Receivership Estate to initiate a lawsuit against Weeden, the Receiver will move to for leave to sue Weeden prior to commencing litigation against it.

**I.     Litigation - Rajo Action**

97.      During the Compensation Period, the Receiver and Z&Z continued its lawsuit, *Jed Horwitt Esq., Receiver v. Rajo Corp. d/b/a Rajo Capital Management et al.*, (Civil Action No.: 3:17-cv-02077-JCH) (the "Rajo Action) against Rajo Corp. d/b/a Rajo Capital Management ("Rajo"), Victor J. Danilevics ("Danilevics"), and Tobyn Ingebrigtson ("Ingebrigtson", and collectively, the "Rajo Defendants") in the United States District Court for the District of Connecticut. The Rajo Action seeks to recover approximately $204,000 that Varacchi caused Sentinel to pay to or for the benefit of the Rajo Defendants pursuant to CUFTA.

98.     During the Compensation Period, counsel for the Rajo Defendants informed Z&Z attorneys that the Rajo Defendants did not intend to settle the Rajo Action nor would they file an appearance and respond to the Receiver's complaint.

99.     Accordingly, on April 16, 2018, Z&Z attorneys filed a Motion for Default against the Rajo Defendants. ECF No. 16.

100.    On April 18, 2018, the Court granted the Motion for Default, and ordered the Receiver to file a Motion for Default Judgment by May 18, 2018. ECF No. 17.

101.    On May 18, 2018, the Receiver filed his Motion for Default Judgment, seeking judgment against the Rajo Defendants in the amount of $204,000. ECF No. 18.

102.    On July 24, 2018, after the Compensation Period, the Court entered a ruling

conditionally granting the Motion for Default Judgment subject to the Receiver withdrawing counts two, three, and four of the complaint. ECF No. 19.

103.    On July 25, 2018, Z&Z attorneys filed notice with the Court of the Receiver's withdrawal of counts two, three, and four of the complaint without prejudice. ECF No. 20.

104.    On July 26, 2018, the Court entered default judgment in favor of the Receiver and against Rajo Corp in the amount of $176,127.16, against defendant Danilevics in the amount of $3,000, and against defendant Ingebrigtson in the amount of $25,500. ECF No. 22.

**J.      Investigation into and Demand upon Ralph Giorgio**

105.    During the Compensation Period, Z&Z attorneys continued their investigation into potential causes of action against Ralph Giorgio ("Giorgio").

106.    Giorgio was introduced to Varacchi through Steve Simmons ("Simmons") in mid-2015.[5]

107.    Giorgio became a manager on the Sentinel platform and was added to Sentinel's payroll in December 2015.

108.    From December 2015 to May 2016, Giorgio received a gross monthly salary of $2,058.34 from Sentinel.

109.    In June 2016, at Giorgio's request, Varacchi caused Sentinel to increase Giorgio's gross monthly salary to $20,000.

---

[5] On January 26, 2017, the United States filed a criminal complaint against Simmons alleging that between 2013 and January 2017, Simmons solicited investments by falsely representing to investors that their funds would be used by the hedge fund for legitimate, specified investment purposes, that they would receive specific rates of return, and that their investments would not be placed at risk or commingled with other funds. *See United States v. Simmons and Meli*, Crim. No. 1:17-cr-00127-KMW (S.D.N.Y.). In fact, Simmons failed to invest the investor monies as promised, but, instead, diverted investor funds for his own use and also, together with others, used the money in a Ponzi-like fashion to fund the repayment of earlier investors in the hedge fund whose redemption requests could not be forestalled. On October 30, 2017, Simmons plead guilty to one count of conspiracy to commit securities fraud and wire fraud.

110.     From June 2016 until the collapse of Varacchi's Ponzi scheme, Giorgio received more than $120,000 from Sentinel (the "Giorgio Transfers").

111.     Upon information and belief, Sentinel did not receive any valued in exchange for the Giorgio Transfers. The Giorgio Transfers were not a draw upon incentive-based payments as Giorgio did not manage sufficient assets on the Sentinel platform to justify the amount received. Rather, upon information and belief, the Giorgio Transfers were made with the expectation that the money would be repaid either to Sentinel or Varacchi.

112.     During the Compensation Period, Z&Z attorneys served Giorgio with a settlement offer. Giorgio allowed the offer to lapse by failing to respond within the provided time period. However, after the offer lapse, Z&Z attorneys were contacted by an attorney for Giorgio and have scheduled a time to discuss a possible settlement of the Receivership Estates' claims related to the Giorgio Transfers.

113.     The Receiver's investigation of these and other claims against Giorgio is ongoing. The Receiver is not in a position at this time to report on such claims or predict the likelihood or extent of any recovery. The Receiver will not only have to assess the legal merits of any such claims but will also have to make a practical evaluation of the potential benefit to the Receivership Estate weighed against the cost of pursuing each claim.

114.     In the event that the Receiver determines that it is in the best interest of the Receivership Estate, the Receiver will move to for leave to sue Giorgio prior to commencing litigation against it or take such other action as the Receiver determines appropriate and in the best interest of the Receivership Estate under the circumstances.

### K.     Investigation into Kizzang, LLC

115.     During the Compensation Period, the Receiver, through Z&Z, continued its

investigation into Kizzang, LLC ("Kizzang"). Kizzang is a "Private Investment" as that term is defined in the Receivership Order. Accordingly, since his appointment, the Receiver has taken action to determine the value of the investment, to marshal the investment, and ultimately to liquidate it.

116.    While it was operating, Kizzang provided internet-based sweepstakes, lottery, poker, slots, bingo, and fantasy sports entertainment services online in the United States. Upon information and belief, Kizzang ceased operating sometime in 2017.

117.    During the time Kizzang was operating, Varacchi used investor funds deposited with Sentinel to become one of Kizzang's chief investors. Together with Simmons, the other primary investor in Kizzang, Varacchi pitched Kizzang to potential investors, recruited investors from Sentinel and Radar, and consulted with Kizzang's principal, Robert Alexander, on the day to day operations of Kizzang.

118.    In total, from September 15, 2014, through November 1, 2016, Varacchi, in furtherance of his Ponzi scheme, caused Sentinel to make a series of transfers to Kizzang in the aggregate amount of $2,278,000 (collectively, the "Kizzang Transfers").

119.    In exchange for the Kizzang Transfers, Kizzang issued Varacchi 3,600,000 Class C Kizzang shares, 5,400,000 Class D Kizzang shares, and, upon information and belief, 1,152,666 Class E Kizzang shares (together, the "Kizzang Shares"). Upon information and belief, the Kizzang Shares issued in Varacchi's name totaled approximately 10% of Kizzang's ownership interests.

120.    Sentinel, and its investors, received nothing in exchange for the Kizzang Transfers.

121.    Based on information obtained from Varacchi, but not yet verified, Z&Z attorneys have reason to believe that – despite its mounting liabilities and apparent lack of liquid capital –

Kizzang's intellectual property could potentially be a source of value to the Receivership Estate.

122.    By virtue of the Receivership Orders, the Receivership Estate now holds the rights of an equity holder established by the Kizzang Shares or, alternatively, the rights of a creditor to assert a cause of action to avoid the Kizzang Transfers as intentional and constructive fraudulent transfers pursuant to CUFTA.

123.    Prior to the Compensation Period, on March 26, 2018, Z&Z attorneys subpoenaed Kizzang's books and records. In response to the March 26 subpoena, counsel for Kizzang represented to Z&Z attorneys that Kizzang had been evicted from its leased headquarters in Las Vegas and that Kizzang's former landlord was in possession of Kizzang's personal property – including the books and records requested in the Receiver's subpoena.

124.    On April 7, 2018, counsel for Kizzang represented to Z&Z attorneys that Kizzang had negotiated a settlement with its former landlord, and that responsive documents would be forthcoming.

125.    On April 27, 2018, after multiple failed attempts to follow up with Kizzang's counsel, Z&Z attorneys threatened to seek judicial relief if Kizzang did not produce the subpoenaed documents. In response, Kizzang's counsel represented to Z&Z attorneys that Kizzang's books and records were in storage in Las Vegas, and that Kizzang could not bear the cost of production. Z&Z attorneys agreed to extend the subpoena deadline under the circumstances if Kizzang would begin to produce its financial records. On May 1, 2018, Kizzang provided its bank records.

126.    On May 11, 2018, Z&Z attorneys requested Kizzang produce all documents appraising or estimating the value of Kizzang's patent portfolio and Kizzang's counsel agreed to provide responsive documents.

127.    On May 22, 2018, Kizzang's counsel contacted Z&Z attorneys and represented that all of Kizzang's books and records had been lost in transit from Las Vegas to New York. Kizzang's counsel further represented that Kizzang had no documents appraising or estimating the value of Kizzang's patent portfolio.

128.    On May 31, 2018, Z&Z attorneys demanded adequate assurances that Kizzang was acting in good faith and requested authorization from Kizzang to file UCC-1 financing statements to provide notice to third parties of the Receiver's claim and to establish the Receivership Estate's priority to Kizzang's patent portfolio in anticipation of a settlement.

129.    On June 1, 2018, Kizzang's attorney informed Z&Z attorneys that Kizzang's books and records had, in fact, been delivered on May 27, 2018. Kizzang refused the Receiver's request for authorization to file a UCC-1. In response, Z&Z attorneys drafted a motion for leave to sue Kizzang and an accompanying complaint asserting causes of action to avoid the Kizzang Transfers under CUFTA.

130.    On June 13, 2018, Kizzang's attorney informed Z&Z attorneys that the Federal Bureau of Investigation had seized Kizzang's records as part of a criminal investigation.

131.    On June 29, 2018, the principal of Kizzang contacted Z&Z attorneys directly to engage in further discussions with the Receiver and Receivership Estate.

132.    In the event that the Receiver determines that it is in the best interest of the Receivership Estate to initiate a lawsuit against Kizzang, the Receiver will move to for leave to sue Kizzang prior to commencing litigation against it.

L.    **Investigation into Entourage Funding, LLC**

133.    During the Compensation Period, the Receiver and Z&Z attorneys continued their investigation into potential causes of action related to the $500,000 in transfers from Sentinel to Entourage Funding, LLC ("Entourage").

134.    Based on Z&Z's investigation, it appears that Entourage was an investment vehicle for various recreational marijuana companies based out of Colorado. Varacchi's contacts at Entourage were Jeffery Koslosky and Scott Gebard, both of whom have a history of fraudulent activity, having been involved in a penny stock pump and dump scheme in the early 2000s. *See SEC v. Regency Group LLC et al.*, No. 09-cv-00497 (D. Colo.). Koslosky and Gebard represented Entourage as an investment vehicle for purchasing the minority membership interest that a certain Igbal Saran held in a marijuana retailer "Doctors Orders, LLC" ("Doctors Orders") with the assistance of the majority owner, Joshua David Bartch ("Bartch"). Koslosky, Gebard, and Bartch pitched Varacchi together, and flew him out to tour the Doctors Orders facilities to entice his investment.

135.    Prior to the Compensation Period, the Receiver, through Z&Z, subpoenaed documents and records from Doctors Orders, LLC.

136.    During the Compensation Period, counsel for Doctors Orders contacted Z&Z attorneys to open up discussions regarding the scope of the subpoena. Counsel for Doctors Orders informed Z&Z attorneys that Igbal Saran was never a minority owner of Doctors Orders, and that Bartch was no longer the majority owner. According to counsel for Doctors Orders, Bartch has been ordered by a Federal District Court to divest himself of his interest in Doctors Orders as a condition of probation. Bartch had transferred his interest in Doctors Orders to the current owners for $1.

137.    Counsel for Doctors Order provided responsive documents regarding all transfers from Entourage to Doctors Orders, as well as information on transfers from Entourage to other third-parties.

138.    Shortly after Z&Z attorneys began their investigation into Entourage, Entourage and Bartch sent a demand letter to Doctors Orders regarding claims related to Bartch's $1 transfer of ownership and an alleged default of $600,000 on a line of credit extended to Doctors Order from Entourage. Doctors Orders responded denying any liability but offered to sell Doctors Order back to Bartch for $3.5 million – the amount of back taxes Doctors Orders incurred during Bartch's control.

139.    During the Compensation Period, Z&Z attorneys actively monitored the situation to evaluate the best strategy for maximizing the value of the transfers to Entourage for the benefit of the Receivership Estate.

140.    Also during the Compensation Period, Z&Z attorneys reviewed and analyzed Entourage's bank records to discover payments made to a separate marijuana company - Mesa Greens, LLC. Upon further investigation, Z&Z attorneys discovered that this company was also owned by Bartch and is doing business as Doctor's Orders – Pueblo West. Z&Z attorneys subpoenaed documents and records from Mesa Greens, LLC, but, as of the filing of this Application, have not received a response.

141.    The Receiver's investigation of these and other claims against Entourage and related parties is ongoing. The Receiver is not in a position at this time to report on such claims or predict the likelihood or extent of any recovery. The Receiver will not only have to assess the legal merits of any such claims but will also have to make a practical evaluation of the potential benefit to the Receivership Estate weighed against the cost of pursuing each claim.

142.    In the event that the Receiver determines that it is in the best interest of the Receivership Estate to initiate a lawsuit against Entourage and related parties, the Receiver will move to for leave to sue prior to commencing litigation against them.

### M.    Investigation of Other Private Investments

143.    During the Compensation Period, the Receiver continued to investigate the Private Investments. The Receiver has researched and analyzed numerous entities that identified as potentially constituting Private Investments which the Receiver may recover for the benefit of the Receivership Estate.

144.    After reviewing the records of the Receivership Estate, as well as the documents produced pursuant to the Receiver's requests, the Receiver has preliminarily determined that the investments in Zipway LLC, Gravy, Inc., Invigilio, LLC, and Greenhouse Solutions, Inc. are unlikely to provide any value to the Estate.

145.    During the Compensation Period, Z&Z attorneys received a call from counsel for STRV informing them that StereoCast has requested that StereoCast's access to its mobile application be reestablished. STRV sought the Receiver's consent to grant StereoCast such access. Given that the value of the Estate's equity interest in StereoCast depends almost entirely on StereoCast's continued operation, and in the exercise of his reasonable business judgment, the Receiver gave his consent. This development indicates to the Receiver that StereoCast has, at least in a limited capacity, resumed operating. Shortly before the end of the Compensation Period, Z&Z attorneys learned that StereoCast's application was available for downloading in the Apple app store.[6] Following the Compensation Period but prior to the filing of this Application, Z&Z attorneys served StereoCast with a subpoena for documents relating to their current operations.

---

[6] The application can be viewed and downloaded at: https://itunes.apple.com/cz/app/stereocast/id1027457656

146.    During the Compensation Period, Z&Z pursued outstanding document subpoenas served upon Roots Athletics, LLC ("Roots"). Roots Athletics was a mixed martial arts and Brazilian Jiu Jitsu studio based out of Philadelphia that Varacchi invested in using $110,000 of funds in Sentinel's account. Prior to the Compensation Period, Z&Z attorneys had served multiple subpoenas on Roots to no avail. During the Compensation Period, Z&Z attorneys determined that Varacchi's co-investor, Brian Rabinowitz ("Rabinowitz"), had sold substantially all the assets of Roots to another Jiu Jitsu company at some point in 2017 without providing notice to Varacchi or the Receiver. Z&Z attorneys have contacted the attorney for Rabinowitz to discuss the Root Athletics transaction with Rabinowitz in person.

147.    As discussed in Sections III K and L above, the Receiver is in the process of determining how to liquidate the Receivership Estate's interest in Kizzang and Entourage in such a way as to maximize the value available for distribution to Claimants.

148.    The Receiver and Z&Z attorneys are evaluating potential fraudulent transfer and other causes of action against Private Investment companies which received money from the Receivership Entities but did not provide the Receivership Estate with formal equity interests or other value.

### N.    Actual and Anticipated Disbursement of Assets

149.    In accordance with the Court's Order Approving the Fourth Quarterly Fee Application (ECF No. 60), the Receiver has made the following distributions to Z&Z:

| Date | Recipient | Amount | Reason | Authority |
|------|-----------|--------|--------|-----------|
| 5/21/18 | Z&Z | $155,817.27 | 80% of Fees and 100% of Expenses from January 1, 2018 to March 31, 2018 | Order Approving Fourth Interim Fee Application (ECF No. 60) |

150.    The Receiver and Z&Z have assessed fees for their services and Z&Z have advanced all necessary expenses, which are requested for reimbursement through this Application. (*See* Ex. C.)

151.    Provided that the Court awards the fees and expenses requested in this Application, appropriate disbursements will be reflected on the Receiver's next interim fee application filed after such award.

152.    After receipt of the $1,442,082 in accordance with the terms of the Kostiner Settlement Agreement, the Receiver currently holds approximately $3,605,358 in the Receivership Account.

153.    The Receiver has determined that $3,100,000[7] of the cash available in the Receivership Account should be made available for distribution to the holders of Allowed Claims in accordance with the Rising Tide Method as set forth in **Exhibit C** of the Motion to Approve Plan of Distribution (the "Proposed Interim Distribution").

154.    Assuming this Court enters of the proposed order granting the relief requested in the Motion to Approve Plan of Distribution, the Receiver will then make the first interim distribution to holders of Allowed Claims within ninety (90) days thereafter.

---

[7] $845,857 of the $3,100,000 available for distribution shall be reserved for Remaining Disputed Claims consistent with the proposed treatment of such Claims set forth in **Exhibits B** and **Exhibit C** of the Motion to Approve Plan of Distribution.

155.    The Receiver has proposed to establish a separate account segregated from the Receivership Account (the "Reserve Account") to hold $1,351,719 for the following purposes:

      a.    $34,730 on account of ICBC's potentially secured claim ($6,991 from Proposed Interim Distribution amount, $27,739 balance reserved from the Receivership Account);

      b.    $554,822 on account of Advanced Entertainment's Proposed Interim Distribution amount;

      c.    $284,044 on account of N. Fortino's Proposed Interim Distribution amount;

      d.    $10,000 for potential Tax Claims;

      e.    $102,838 for 20% holdback on approved Priority Claims for administrative expenses; and,

      f.    $365,285 for anticipated Priority Claims for administrative expenses.

156.    As outlined above, $845,857 of the $1,351,719 shall be reserved from the Proposed Interim Distribution on account of certain Remaining Disputed Claims as set forth in **Exhibit B** of the Motion to Approve Plan of Distribution. The remaining $505,862 shall be reserved from the Receivership Account for the payment of approved and anticipated Priority Claims for administrative expenses, potential unfiled Tax Claims, and the allegedly Secured Claim of ICBC.

157.    As part of the Motion to Approve Plan of Distribution, the Receiver has also requested the Court modify the Asset Freeze Order to grant the Receiver the necessary authority to establish such a Reserve Account.

158.    After establishing the Reserve Account, the Receiver will include updates on the status of the Reserve Account and the Remaining Disputed Claims in the Receiver's Quarterly Reports.

### O. **Anticipated Closure**

159.     At this time, it is premature for the Receiver to speculate as to when this Receivership Proceeding will be ready to close.

## IV. **DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE**

160.     As of the end of the Compensation Period, the following assets are a part of the Receivership Estate:

a.     The Receivership Account, which is valued at $2,163,862.33;

b.     The Private Investments, which value the Receiver is presently investigating; and

c.     Any and all causes of action to recover money and possibly other assets for the benefit of the Receivership Estate, which causes of action the Receiver is presently investigating and evaluating, including, but not limited to, the claims against the TAM Defendants, the Sarroff Defendants, the Rajo Defendants, Kostiner, Weeden, Kizzang, Entourage, and Giorgio.

161.     With respect to the Private Investments, the Receiver has identified the following securities:

a.     Kizzang: 3,600,000 Class C shares, 5,400,000 Class D shares, and 1,152,666 Class E evidenced by certificates identifying Varacchi as the owner of such interest;

b.     Greenhouse: 250,000 shares, evidenced by a certificate identifying Varacchi as the owner of such interest; and

c.     StereoCast: 150,000 shares in the name of Varacchi, evidenced by a certificate identifying Varacchi as the owner of such interest.

162.     The Receiver is investigating how best to liquidate and maximize the value of these equity interests in Kizzang, Entourage, Roots, and StereoCast.

## V.  THE COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES

### A.  The Governing Legal Standard

163.  The District Court has the power to appoint a receiver and to award the receiver fees for his services and for expenses incurred by the Receiver in the performance of his duties. *See Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) ("[T]he receiver diligently and successfully discharged the responsibilities placed upon him by the Court and is entitled to reasonable compensation for his efforts."); *see also Securities & Exchange Comm'n v. Elliott*, 953 F. Supp. 1560 (11th Cir. 1992) (receiver is entitled to compensation for faithful performance of his duties.).

164.  The District Court has discretion to determine compensation to be awarded to a court-appointed equity receiver and his counsel and "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).

165.  The case law and other authority may provide "convenient guidelines," but ultimately "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

166.  In awarding counsel fees in Securities Act receiverships, "[t]he court will consider ... the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods.*, 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).

167.    While "results are always relevant," a good result may take a form other than a "bare increase in monetary value." *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."). Overall results can be determined only at the conclusion of the Receivership Proceeding.

168.    Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.

**B.**    **Application of the Governing Legal Standard to the Application**

169.    Based on the foregoing, the Receiver and Z&Z respectfully submit that the services for which they seek compensation in this Application were necessary for, and beneficial to, the orderly administration of the Receivership Estate.

170.    As more fully set forth throughout this Application and as detailed in the exhibits submitted herewith, the issues addressed by the Receiver and Z&Z have been and continue to be highly complex, requiring investigation of an alleged fraud that spanned years, consisted of many poorly-documented transactions and involved numerous investors, Private Investments and financial institutions. The Receiver and Z&Z have made substantial progress in investigating the Receivership Estate's assets and in commencing litigation on behalf of the Receivership Estate.

171.    The Receiver and Z&Z respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved. The professional services were performed expediently and efficiently. Substantial progress has been accomplished during the Compensation Period and since

the Receiver's appointment May 1, 2017.

172.    At the same time, the Receiver and Z&Z have agreed to considerable public service discounts, which exceeded even those generous discounts offered in the Receiver's initial application.

173.    Furthermore, the Commission has reviewed this Application and has stated that it has no objection to the approval of the professional fees and expenses requested herein.

174.    Accordingly, the Receiver and Z&Z submit that the compensation requested herein is fair, reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties-in-interest.

       C.    **Source and Manner of Payment**

175.    The Receivership Estate contains cash held in the Receivership Account.

176.    As stated above, the Motion to Approve Plan of Distribution contemplates the establishment of a separate Reserve Account for anticipated Priority Claims for administrative expenses.

177.    The Receiver and Z&Z request that the Court enter an order permitting the approved fees and reimbursed expenses to be paid from the Receivership Account or Reserve Account, whichever is applicable, less the 20% holdback (applicable only to fees) which shall be held in the Receivership Account or Reserve Account pending this Court's further order as to the disposition of such funds.

**WHEREFORE**, Jed Horwitt, Esq., Receiver, and Zeisler & Zeisler, P.C., counsel to the Receiver, respectfully request that (i) this Application be granted; (ii) the Receiver and Z&Z be awarded an allowance of $176,584.60 for legal services rendered during the Compensation Period,

and $3,948.92 for the reimbursement of expenses, subject to a 20% holdback applicable to fees for services; and (iii) grant such other and further relief as this Court deems just and proper.

   Dated at Bridgeport, Connecticut, this 13th day of August, 2018

          Respectfully submitted,

          JED HORWITT, ESQ., RECEIVER

          */s/ Jed Horwitt*
          Jed Horwitt, Receiver

          ZEISLER & ZEISLER, P.C.,
          COUNSEL TO RECEIVER

        By: */s/ Stephen M. Kindseth*
          Stephen M. Kindseth (ct14640)
          Rion M. Vaughan (ct30440)
          Zeisler & Zeisler, P.C.
          10 Middle Street, 15th Floor
          Bridgeport, CT  06604
          Telephone: 203-368-4234 X 245
          Email: skindseth@zeislaw.com
             rvaughan@zeislaw.com
          His Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I, Rion M. Vaughan, hereby certify that a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System and also at http://jedhorwittreceiver.com/.

*/ s / Rion M. Vaughan*
Rion M. Vaughan (ct30440)
