## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 3:17-cv-00155-VAB |
| MARK J. VARACCHI and ) | |
| SENTINEL GROWTH FUND ) | |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants, ) | |
| and ) | |
| ) | |
| RADAR ALTERNATIVE FUND LP and ) | |
| RADAR ALTERNATIVE MASTER FUND SPC, ) | |
| ) | |
| Relief Defendants. ) | Janaury 28, 2021 |

## FIFTEENTH INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS

## <u>TABLE OF CONTENTS</u>

I.   SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED ...................... 3
  A.   Discounts ...................................................................................................... 6
  B.   Fee Schedules .............................................................................................. 7
  C.   Activity Categories ...................................................................................... 9
II.   SUMMARY OF CASH ON HAND ....................................................................... 10
III.   SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE ......................... 11
  A.   The Receiver's Website and Investor Contact ............................................ 11
  B.   The Fourteenth Quarterly Status Report .................................................... 11
  C.   Marshaling of Receivership Assets and Receipt of Assets by Receiver ...................... 12
  D.   Claims Administration ............................................................................... 12
  E.   Litigation – Sarroff Action ........................................................................ 19
  F.   Civil Action Against Ralph Giorgio ........................................................... 21
  G.   Investigation of Private Investments ......................................................... 24
  H.   Tolling Agreements with Mark J. Varacchi and Jason Rhodes .................... 25
  I.   Actual and Anticipated Disbursement of Assets .......................................... 26
  J.   Anticipated Closure .................................................................................... 27
IV.   DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE .............................. 27
V.   THE COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES ............... 28
  A.   The Governing Legal Standard .................................................................... 28
  B.   Application of the Governing Legal Standard to the Application ................. 30
  C.   Source and Manner of Payment .................................................................. 31

**FIFTEENTH INTERIM APPLICATION FOR PROFESSIONAL FEES AND EXPENSES INCURRED BY THE RECEIVER AND HIS PROFESSIONALS**

Jed Horwitt, Esq. (the "Receiver"), as the Receiver appointed by this Court in the above-captioned action (the "Receivership Proceeding") commenced by the Securities and Exchange Commission (the "SEC" or "Commission"), by and through his undersigned counsel, and Zeisler & Zeisler, P.C. ("Z&Z"), as counsel for the Receiver, pursuant to this Court's Order Appointing Receiver entered May 1, 2017 (ECF No. 12, the "Receivership Order") and Order Reappointing Receiver (ECF No. 47, the "Reappointment Order", and together with the Receivership Order, the "Receivership Orders") entered February 14, 2018, respectfully submits this fifteenth interim application (the "Application") for professional fees and expenses incurred on behalf of the Receivership Estate (as defined in the Receivership Orders) by the Receiver, Z&Z and the Receiver's special counsel for transactional services, Karp & Langerman, P.C. ("K&L") during the period commencing October 1, 2020, through and December 31, 2020 (the "Compensation Period"). In advance of filing, the Receiver provided the Commission with a copy of this Application (including all exhibits), and the Commission's counsel stated that the Commission has no objection to the approval of the professional fees and expenses requested herein.

In support of this Application, the Receiver and Z&Z respectfully represent as follows:

## I.   SUMMARY OF PROFESSIONAL FEES AND EXPENSES REQUESTED

1.      Jed Horwitt, Esq. serves in his capacity as the Court-appointed Receiver for Sentinel Growth Fund Management, LLC ("Sentinel"), Radar Alternative Fund LP ("Radar LP") and Radar Alternative Master Fund SPC ("Radar SPC" and, together with Radar LP, collectively, the "Relief Defendants," and the Relief Defendants together with Sentinel, collectively, the "Receivership Entities").

2.      This Application has been prepared in accordance with the Billing Instructions for

Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the

"SEC Guidelines") and the Receivership Orders.

      3.      Pursuant to the SEC Guidelines, the following exhibits are attached to this

Application:

      a.      The completed Standardized Fund Accounting Report ("SFAR"), in the form prescribed by the SEC Guidelines, and certified by Receiver, is attached hereto as Exhibit A;

      b.      A Certification of Compliance with the SEC Guidelines by the Receiver and Z&Z is attached hereto as Exhibit B;

      c.      A summary of total expenses for which reimbursement is requested for Z&Z is attached hereto as Exhibit C;

      d.      Time records summarizing the work performed by the Receiver and his legal professionals and paraprofessionals for each of their Activity Categories (as hereinafter defined) are attached hereto as Exhibits D-1; D-2; D-3; D-4; D-5; D-6; D-7; D-8; D-9; D-10; D-11; D-12; and D-13.[1]

      e.      A Certification of Compliance with the SEC Guidelines by K&L is attached hereto as Exhibit E;

      f.      The time record summarizing the work performed by K&L legal professionals for a single Activity Category, Asset Analysis and Recovery, during the Compensation Period is attached hereto as as Exhibit F

      4.      The Receiver and Z&Z attorneys and paraprofessionals have expended a total of

64.4 hours working on this matter during the Compensation Period. The Receiver and Z&Z seek

allowance of compensation of services rendered during the Compensation Period on behalf of the

Receivership Estate in the amount of $19,258.40, and reimbursement of actual and necessary

---

[1] Because their contents include privileged and confidential material, protected attorney work-product, and other sensitive information describing, *inter alia*, the Receiver's strategy in this Receivership Proceeding and related litigation, and pursuant to the Court's Order entered August 11, 2017 (ECF No. 25), Exs. D-1 through D-13 are filed under seal. Furthermore, the Receiver and Z&Z have intentionally omitted time records from their Activity Category Six (Application for Professional Fees and Expenses), because they are not requesting compensation for services performed under this Activity Category.

expenses in the amount of $7,918.18.

5.      The Receiver's special counsel to provide transactional services, K&L, has expended a total of 1.0 hours working on this matter during the Compensation Period. K&L seeks allowance of compensation of services rendered during the Compensation Period on behalf of the Receivership Estate in the amount of $325.00.

6.      The Receiver and Z&Z acknowledge that their fee compensation is subject to a twenty percent (20%) holdback, pursuant to the SEC Guidelines and the Receivership Orders. The Receiver requests that K&L not be subject to a twenty percent (20%) holdback considering the relatively *de minimus* amount incurred to complete the work requested by the Receiver to be performed by K&L.

7.      The fees assessed reflect the hours worked by the Receiver, Z&Z and K&L attorneys and paraprofessionals, and the hourly rates applicable at the time that they rendered their services, as modified by the significant discounts provided by the Receiver and Z&Z (described below).

8.      These amounts also take into account all relevant circumstances and factors as set forth in the Connecticut Rules of Professional Conduct and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the professionals and paraprofessional working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver under the Receivership Orders.

9.      Section III below summarizes the Receiver's administration of the Receivership Estate since his appointment. A narrative description of the particular services provided by the Receiver and Z&Z's attorneys and paraprofessionals is included in the time records attached as

Ex. D-1 through D-13. A narrative description of the particular services provided by K&L attorneys is included in the time records attached as Ex. F-1.

10.      Z&Z's expense reimbursements requested are principally consist in the following: (i) PACER charges for accessing electronic documents in the numerous federal litigations relevant to the Receivership Proceeding; (ii) expenses associated with the Receiver's website; (iii) photocopying; (iv) processing and hosting of electronically stored information related to litigation relevant to the Receivership Proceeding; (v) online legal research; and (vi) court reporter fees for transcripts. (*See* Ex. C.)

11.      The Receiver, Z&Z and K&L have not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime. Nor have the Receiver, Z&Z or K&L requested reimbursement for any meals during the Compensation Period.

12.      The Receiver and Z&Z have complied with the SEC Guidelines' internal photocopying rates as follows: $0.15 per page for black and white and $1.00 per page for color copies.

### A.  Discounts

13.      As proposed by the Receiver as part of his application for selection as receiver submitted to the Commission, and as provided in the Receivership Orders, the Receiver and Z&Z have consented to and implemented substantial public service discounts with respect to their billing rates for services provided in this Receivership Proceeding.

14.      More specifically, and as shown in the fee schedules set forth below, Z&Z has consented to 20% public service discounts to its regularly applicable hourly rates for all legal professionals and paraprofessionals.

15.     The Receiver originally agreed to discount his generally applicable hourly rate for services provided when serving primarily in his capacity as Receiver to $250 per hour, reflecting a 50% discount. Notwithstanding, as an additional discount, despite the fact that many of the services provided by the Receiver throughout this Receivership Proceeding were mostly legal in nature, the Receiver and Z&Z have voluntarily applied the much more deeply discounted $250 hourly pay rate to all of the Receiver's time.

### B.  Fee Schedules

16.     The fee schedule for the Receiver, showing: his name; the hourly rate applied to his services in this Receivership Proceeding and his customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his services during the Compensation Period; is as follows:

| Receiver | Rate (Cust. Rate) | Rate Discount | Hours | Amount Billed | Amount Discounted |
|---|---|---|---|---|---|
| Horwitt, Jed | $250 ($500) | $250 | 1.20 | $300.00 | $300.00 |

17.     The fee schedule for all Z&Z legal professionals (other than the Receiver) who provided services during the Compensation Period, showing for each: his or her name; the hourly rate applied to his or her services in this Receivership Proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period; is as follows:[2]

---

[2] The schedule does not include amounts incurred to prepare the prior fee application since Z&Z is not seeking compensation for such services.

| Legal Professional | Rate (Cust. Rate) | Rate Discount | Hours | Amount Billed | Amount Discounted |
|---|---|---|---|---|---|
| Kindseth, Stephen | $340 ($425) | $85 | 7.30 | $2,482.00 | $620.50 |
| Moriarty, James | $320 ($400) | $80 | 14.90 | $4,768.00 | $1,192.00 |
| Romney, Aaron | $320 ($400) | $80 | 26.0 | $8,320.00 | $2,080.00 |
| Cesaroni, John | $240 ($300) | $60 | 12.70 | $3,048.00 | $762.00 |
| TOTALS: | | | 60.90 | $18,618.00 | $4,654.50 |

18.     The fee schedule for the Z&Z legal paraprofessional who provided services during the Compensation Period, showing: his or her name; the hourly rate applied to his or her services in this Receivership Proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period; is as follows:

| Legal Paraprofessional | Rate (Cust. Rate) | Rate Discount | Hours | Amount Billed | Amount Discounted |
|---|---|---|---|---|---|
| Joseph, Kristin | $148 ($185) | $37 | 1.0 | $148.00 | $37.00 |
| Accurso, Ian | $148 ($185) | $37 | 1.30 | $192.40 | $48.10 |
| TOTALS: | | | 2.30 | $340.40 | $85.10 |

19.     The fee schedule for all K&L legal professionals who provided services during the Compensation Period, showing for each: his or her name; the hourly rate applied to his or her services in this Receivership Proceeding and his or her customary hourly rate; the discount reflected in the applied hourly rate; the number of hours of services performed in the Compensation Period; the amount billed for such services in the Compensation Period; and the amount of the discount to his or her services during the Compensation Period; is as follows:

| Legal Professional | Rate (Cust. Rate) | Rate Discount | Hours | Amount Billed | Amount Discounted |
|---|---|---|---|---|---|
| Langerman, Noel | $325 ($325) | $0.00 | 1.0 | $325.00 | $ n/a |

C. **Activity Categories**

20.     Pursuant to the SEC Guidelines, the Receiver, Z&Z and K&L have utilized the following activity categories (each an "Activity Category," and, collectively, the "Activity Categories") under which the following fees have been incurred during the Compensation Period:

Activity Categories Utilized by Receiver and Z&Z Legal Professionals

a.      Category One: Case Administration, 8.0 hours, $2,174.40 (*see* Ex. D-1);

b.      Category Two: Asset Analysis & Recovery, 0 hours, $0.00 (*see* Ex. D-2);

c.      Category Three: Asset Disposition, 0 hours, $0.00 (*see* Ex. D-3);

d.      Category Four: Business Operations, 0 hours, $0.00 (*see* Ex. D-4);

e.      Category Five: Claims Administration & Objections, 8.50 hours, $2,746.00 (*see* Ex. D-5);

f.      Category Six: Application for Professional Fees and Expenses (the Receiver and Z&Z does not seek compensation for thefees incurred for these services in this Application) (*see* Ex. D-6);

g.      Category Seven: Litigation – Taran Asset Management, LLC, *et al.*, 0 hours, $0.00 (*see* Ex. D-7); and

h.      Category Eight: Litigation – A. L. Sarroff Management, LLC, *et al.*, 25.60 hours, $8,198.00 (*see* Ex. D-8).

i.      Category Nine: Litigation – Shay Kostiner, 0 hours, $0.00 (*see* Ex. D-9).

j.      Category Ten: Litigation – Weeden Prime Services, LLC,  hours, $0.00 (*see* Ex. D-10).

k.      Category Eleven: Litigation – Rajo Corp., 0 hours, $0.00 (*see* Ex. D-11).

l.      Category Twelve: Litigation – Ralph Giorgio, 0 hours, $0.00 (*see* Ex. D-12).

m.      Category Thirteen: Asset Recovery – Ralph Giorgio, 22.30 hours, $6,140.00 (*see* Ex D-13).

Activity Categories Utilized by K&L Professionals

a.      Category One: Asset Analysis & Recovery, 1.0 hours, $325.00 (*see* Ex. F-1);

## II.      **SUMMARY OF CASH ON HAND**

21.      As of December 31, 2020, the Receiver held in the Receivership Account (as defined and discussed in Section IV-D below) the amount of $527,758.06.

22.      In accordance with the Plan Approval Order, prior to the Compensation Period, the Receiver transferred $801,365.01 from the Receivership Account to a newly established segregated account (the "Reserve Account") to "ensure that if a Remaining Disputed Claim is Allowed, the Receiver shall have funds left to pay such Allowed Claim in the amount provided for in the Plan of Distribution for such category of Claimant." *See* Plan Approval Order § 8(xi). Z&Z attorneys consulted with Verdolino & Lowey, P.C. ("V&L") (the Receiver's accountants and financial advisor) to ensure that the Reserve Account was established as a Qualified Settlement Fund under Section 468B of the Internal Revenue Code, and that the establishment and funding of the Reserve Account did not disrupt the Receivership Account's Qualified Settlement Fund status.

23.      After having distributed payment to a secured creditor in accordance with this Court's Order, and depositing additional reserves in connection with the most recent distribution to Claimants (all as explained more fully below), the Reserve Account has a balance of $1,125,284.47 as of December 31, 2020.

24.      Thus, the Receiver's cash on hand held in the Receivership Account and the Reserve Account, therefore, total, as of December 31, 2020, the amount of $1,653,042.53. This combined balance reflects a net decrease of $66,112.03 during the Compensation Period. (*See* Ex.

A.)

III.     **SUMMARY OF RECEIVER'S ADMINISTRATION OF THE ESTATE**

25.     During the Compensation Period, the Receiver diligently exercised his duties pursuant to the terms of the Receivership Orders and made significant progress in investigating, marshalling and liquidating Receivership Assets for distribution to the holders of Allowed Claims against the Receivership Estate. Items requiring significant work by the Receiver and his professionals, as discussed in more detail below, were, in summary, continuing to litigate previously commenced civil actions and to move forward with his objections to the Remaining Disputed Claims.

26.     Utilizing Z&Z and K&L, the Receiver has undertaken the following on behalf of the Receivership Estate.

**A.   The Receiver's Website and Investor Contact**

27.     At all times during the Compensation Period, the Receiver has maintained a website – http://jedhorwittreceiver.com – that has provided information to the public concerning the Receivership Proceeding, in addition to the more particular notices provided to parties-in-interest.

28.     The website states who the Receiver is and describes his role, provides access to filings in the Receivership Proceeding, and contains contact information such that interested parties may contact Z&Z attorneys by e-mail or telephone with questions, concerns or information.

29.     Z&Z's professionals, on behalf of the Receiver, have fielded and effectively responded to inquiries from investors in order to ensure that they are educated concerning the Receivership Proceeding and the claims management procedures discussed herein.

**B.   The Fourteenth Quarterly Status Report**

30.     The Receiver and Z&Z also prepared and, on October 30, 2020, filed the Fourteenth Quarterly Status Report (ECF No. 200). In drafting the Fourteenth Quarterly Status Report, the

Receiver and Z&Z compiled comprehensive information to update the Court, the Commission and all other parties-in-interest as to the Receiver's operations, the Receivership Estate's assets and the status of various litigation and Claims against the Receivership Estate.

### C.   **Marshaling of Receivership Assets and Receipt of Assets by Receiver**

31.    Shortly after his appointment, pursuant to the Receivership Order, the Receiver opened an account at a financial institution experienced in servicing court-appointed receivers (and like fiduciaries), which account (the "Receivership Account") holds funds marshaled by the Receiver and constitutes a Receivership Asset.[3]

32.    Pursuant to the Court's orders, the Receiver and Z&Z previously undertook to assume control and possession over the funds held in certain frozen accounts and to transfer them to the Receivership Account.

33.    During the Compensation Period, the money market account (holding nearly all of the funds in the Receivership Account) accrued interest at a rate of .01%, amounting to total interest payments of $13.81 for the Compensation Period.

### D.   **Claims Administration**

34.    Prior to the Compensation Period, Z&Z attorneys investigated the Receivership Estate's basis for objecting to the Remaining Disputed Claims. The Receiver then objected to such claims.

a.   Claim Asserted by Neila Fortino

35.    With respect to the claim held by Neila Fortino (the "Fortino Claim"), the Receiver thoroughly analyzed the factual and legal basis for her asserted claim in the amount of $4,038,000.

---

[3] In October, 2017, the Receiver opened a separate money market account to hold the majority of the balance he held for the receivership estate. These two accounts (the checking and money market accounts) are referred to herein collectively as the "Receivership Account."

After the completion of his investigation, on March 11, 2019, the Receiver's counsel articulated to Fortino's counsel his position with respect to the Fortino Claim and the basis for his objection. On May 1, 2019, Forino's counsel responded. The Receiver continued to disagree with Fortino's perspective on her claim.

36.     Accordingly, prior to and during the Compensation Period, the Receiver's counsel prepared his Motion for Determination of Claim Held by Neila Fortino.  The Receiver explained his position that the Fortino Claim against the Receivership Estate should be allowed in the amount of $1,489,550 and no more.[4] Although Fortino never invested directly into the Receivership Entities, her claim is based upon the transfer originally made by the intermediary, Mind the Gap Consulting, LLC ("MTG") to Sentinel in the amount of $4 million, and the subsequent returns on account of this amount from Sentinel to MTG in the amount of $2,560,450. The Receiver stated further that he had confirmed that MTG, in fact, made these investments on Fortino's behalf. Considering this and the surrounding circumstances as more fully explained herein, the Receiver submitted that Fortino should hold the claim rather than MTG.

37.     The Receiver believes that the identity of the person who actually holds the claim does not alter the amount of the claim. The claim amount is apparent through the application of the well-established methodology employed by the Receiver in this case with this Court's approval. Based upon the $4 million transfer from MTG to Sentinel and the distributions to MTG from Sentinel in the amount of $2,510,450, the net amount for this claim equals $1,489,550.

---

[4] As a result of discovery conducted pursuant to this Court's summary procedures order, as referenced herein, the Reciver determined that a $50,000 transfer previously credited against Fortino's claim was not actually received by her. Accordingly, the Receiver has adjusted his position accordingly such that the allowed amount of Fortino's claim should be $1,489,550 (rather than $1,439,550 as previously represented by the Receiver) based on the returns paid to MTG totalling $2,510,450, and the pre-receivership recovery realized by Fortino is, therefore, 62.76% (rather than 64% as previously represented).

Accordingly, it is the Receiver's position that Fortino's submitted claim in the amount of $4,038,000 should be disallowed to the extent it exceeds the amount of $1,489,550.

38.     Finally, as presented by the Receiver, under the "Rising Tide" method of distribution (the "Rising Tide Method"), Fortino's pre-receivership recovery percentage would be 62.76% ($2,510,450/$4,000,000). Since the percentage distribution in this receivership to date has only reached 19.2%, the Receiver further requested that this Court authorize the release of funds held in reserve on account of the Fortino Claim pursuant to the Plan Approval Order (as that term is defined below).

39.     The Receiver filed on July 2, 2019, his Motion for Determination of Claim held by Neila Fortino. (ECF No. 113.) The Clerk scheduled July 23, 2019, as the deadline for a response. Fortino, through her counsel, then requested a continuance of her response date, which the Receiver agreed to and the Court entered an extension of her time to respond through August 22, 2019.

40.     On August 22, 2019, Fortino filed her objection, (ECF No. 140), to the Receiver's motion to determine her claim.

   b.   Claim Asserted by Flatiron Partners

41.     The Receiver, having fully investigated the facts and circumstances surrounding the Flatiron Claim, and having considered applicable legal authority as well as various equitable factors, concluded that the pre-receivership recovery percentage attained by Flatiron was 43.06%—$3,057,931 recovered on account of $7,100,921 invested.

42.     Flatiron argues that its recovery percentage should be 20.74%.

43.     The difference in these two percentages arises from a dispute over whether the $2 million initial investment made on January 15, 2015, and subsequent $2 million withdrawal made

by Sentinel to Flatiron on February 26, 2015, should be included in the pre-receivership percentage calculation. Flatiron seeks to disregard these two initial transfers because it intended at that time to invest only $2 million which it ultimately deposited on March 2, 2015. Ignoring the initial investment and subsequent distribution, the pre-receivership recovery percentage realized by Flatiron would be 20.74% ($1,057,931 recovered on $5,100,921 invested).

44.    The Receiver submits that there is no legal basis to disregard an initial investment and subsequent distribution made by a particular Claimant for purposes of determining the pre-receivership percentage recovery realized by that Claimant. To do so would be fundamentally inconsistent with the "Claim Calculation Methodology" and Rising Tide Method adopted by this Court and applied to all other Claimants in this receivership proceeding.

45.    Flatiron's original $2 million investment was quickly misappropriated as part of the Ponzi scheme. On account of this January 2015 investment, Flatiron received $22,132.45 on February 20, 2015 from Sentinel. On February 26, 2015, when Sentinel transferred $2 million back to Flatiron, Flatiron did not receive the particular $2 million it had originally deposited. Instead, Flatiron received the proceeds of other defrauded investors' deposits. At that moment, Flatiron had received 100% of its original investment from the Ponzi scheme (plus "profits"). That starting point (100% recovery, subject to further adjustment by later deposits and distributions) is perfectly appropriate to further the goal of equalizing the percentage recoveries realized among the defrauded investors. Flatiron benefitted from the Ponzi scheme to the extent it received the product of the Ponzi scheme to the detriment of other defrauded investors.

46.    While Flatiron then reinvested $2 million, such did not alter where the money had come from to make the prior $2 million distribution to Flatiron.  Flatiron also had, at that moment, the choice not to reinvest. Instead, it chose to invest $2 million on March 2, 2015. The re-

investment perpetuated the Ponzi scheme and is taken into account under the Rising Tide Method as an additional investment.

47.    The Receiver has uniformly applied the Rising Tide Method to all Claimants in this receivership proceeding, many of whom would have been materially impacted had the Receiver applied the alternative methodology requested by Flatiron.

48.    In the Receiver's view, there is simply no basis to provide favored treatment to Flatiron or alter the methodologies adopted by this Court and implemented by the Receiver to date.

49.    Accordingly, during the Compensation Period, on July 19, 2019, the Receiver filed his Motion for Determination of Claim held by Flatiron Partners, LP. (ECF No. 125.) The Court scheduled July 23, 2019, as the deadline for a response.

50.    On August 7, 2019, Flatiron, through its counsel, requested a continuance of its response date, (ECF No. 130), which the Receiver agreed to and the Court ordered, (ECF No. 133), extending the time to respond through and including August 23, 2019.

51.    On August 23, 2019, Flatiron filed its objection, (ECF No. 141), to the Receiver's motion to determine her claim

c.    Procedural Posture of Claims Determination

52.    The Receiver attempted to reach with Fortino's and Flatiron's respective counsel an agreed upon schedule for limited discovery and a claims adjudication process which ultimately Fortino and Flatiron opposed.

53.    On December 12, 2019, the Receiver filed his Motion for Entry of Summary Procedures Regarding Receiver's Motions for Determination of Claims Asserted by Neila Fortino and Flatiron Partners, LP. (ECF No. 150.) The Receiver proposed a brief four month period within which to conduct discovery pursuant to the Federal Rules of Civil Procedure.

54.     In response, Fortino and Flatiron sought brief extensions of time to respond to the proposed summary procedures motion. The Receiver consented to such extensions, the deadline for them to respond was extended to January 17, 2020, and they each timely filed their opposition on that day. The Receiver's reply was filed on January 30, 2020. (ECF No. 169.)

55.     On March 20, 2020, this Court entered its Ruling and Order on Motions for Claim Determination and Entry of Summary Procedures (ECF No. 175), which (i) granted the Receiver's request for summary procedures to conduct discovery, and (ii) denied without prejudice the Receiver's motions to determine the claims asserted by Fortino and Flatiron

56.     The parties thereafter agreed upon the specific time frame for the summary procedures and submitted such proposed to this Court on April 16, 2020. (ECF No. 178.) This Court entered such scheduling order on April 17, 2020, (ECF No. 179), which, *inter alia*, provided that discovery shall be completed, not propounded, by August 31, 2020.

57.     The Receiver prepared and served his First Set of Requests for Production to Fortino and Flatiron on April 24, 2020. The Receiver also served a set of Requests for Production on Flatiron Partners, LLC ("FPLLC"), the investment manager for Flatiron that received a distribution of $22,123.45 from Sentinel on February 20, 2015. FPLLC was served with requests for production rather than a subpoena by agreement of counsel.

58.     Also on April 24, 2020, the Receiver was served with Flatiron's First Set of Requests for Production (the "Flatiron Requests") and Fortino's First Set of Requests for Production and First Set of Interrogatories (the "Fortino Requests"). The Flatiron Requests consisted of a single request seeking documents related to Flatiron, FPLLC and Flatiron's principal. The Fortino Requests were far broader and sought documents related to, *inter alia*, Steven Simmons, Simmons' entities Sideris Capital Management, LLC ("Sideris") and MTG, as

well as other Sentinel investors who had invested through third-parties (Fortino invested in Sentinel through Sideris).

59.    The Receiver developed straight-forward search terms, searched the database of documents he maintains, and pulled a number of documents for further review. Based on the intial review of the documents returned from the search terms, the Receiver narrowed the searches related to Simmons and his entities. Documents gathered via the narrowed searches as well as documents related to other similarly situated investors were further culled and reviewed by counsel for responsiveness prior to production. Documents gathered for production to Flatiron were likewise reviewed by counsel prior to production.

60.    The Receiver prepared responses and objections to the Flatiron Requests and the Fortino Requests and served his responses on June 1, 2020. The Receiver also produced responsive documents to Fortino and Flatiron, and made supplemental productions to Fortino on July 14, 2020, and July 28, 2020

61.    The Receiver received productions from Fortino and Flatiron on June 1, 2020, and thereafter conducted a preliminary review of the respective productions.

62.    On August 24, 2020, the Receiver moved on consent for a 30-day extension of time, to and including September 30, 2020, to complete discovery. That motion was granted by order dated August  25, 2020 (ECF No. 199). Thereafter, the Receiver conducted the deposition of Ms. Fortino on September 16, 2020, and the deposition of a representive of Flatiron on September 23, 2020.

63.    During Ms. Fortino's deposition the Receiver's counsel requested that she produce bank records which had been previously requested. Ms. Fortino produced the requested bank records on October 15, 2020.

64.     The Receiver's counsel then met and conferred with counsel for Fortino and Flatiron to work out a proposed procedure for this Court's final determination of each of their claims, which they ultimately agreed upon.

65.     On December 18, 2020, the Receiver filed his Motion, On Consent, for Procedures and Deadlines for the Final Determination of the Claims of Neila Fortino and Flatiron Partners, L.P.  The motion propsed the the Receiver shall file his inition motion on January 15, 2021, the claimants would file their memorandum in opposition on or before February 26, 2021, and the Receiver shall file his reply on or before March 19, 2021. On December 19, 2020, this Court entered the proposed procedures and deadlines.  (ECF No. 205.)

### E.  Litigation – Sarroff Action

66.     During the Compensation Period, the Receiver and Z&Z continued to prosecute the lawsuit captioned, *Jed Horwitt Esq., Receiver v. Alan Sarroff et al.*, (Civil Action No.: 3:17-cv-01902-VAB) (the "Sarroff Action"), against Alan L. Sarroff ("Sarroff"), A.L. Sarroff Management, LLC ("Sarroff Management"), and A.L. Sarroff Fund, LLC ("Sarroff Fund," and all of them collectively, the "Sarroff Defendants"), in the United States District Court for the District of Connecticut.

67.     The Sarroff Action seeks to recover pursuant to Connecticut's Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §§ 52-552 *et seq*. ("CUFTA") over $14 million that Mark J. Varacchi ("Varacchi") had caused Sentinel and Radar LP to pay to or for the benefit of the Sarroff Defendants (the "Sarroff Transfers").

68.     The Sarroff Transfers sought to be avoided as fraudulent transfers consist of: (i) a $7.3 million three-day loan repayment on a loan originally made to cover a day trading margin call; (ii) a $125,000 "fee" for that loan and an additional $25,000 "kicker"; and (iii) "investment" related transfers totaling in excess of $7.7 million

69.     On December 17, 2019, the Receiver filed Plaintiff's Motion for Partial Summary Judgment (ECF No. 184), seeking summary judgment "on Counts One, Five and Nine of the Receiver's Third Amended Complaint—the Receiver's claims to avoid Intentional Fraudulent Transfers caused by Varacchi from the Receivership Entities' accounts to accounts owned by defendants Alan L. Sarroff and A.L. Sarroff Management, LLC pursuant to Conn. Gen. Stat. § 52-552e(a)(1)."

70.     In summary, the Receiver argued that no genuine issue of material fact existed with respect to Varacchi's and Jason Rhodes' operation of a Ponzi scheme from 2013 through 2016, and, the transfers of property made by the Ponzi scheme to the Sarroff Defendants during this time frame.  Therefore, the Receiver submitted, the transfers received by them constituted avoidable fraudulent transfers as a matter of law. Even if successful, any recovery from the Sarroff Defendants would be subject to their asserted "good faith" defense and any other defenses.

71.     On December 17th and early on December18th, 2019, the Sarroff Defendants filed their Defendants' Motion for Summary Judgment (ECF Nos. 184-200) asking this Court to "enter summary judgment for Defendants denying (i) the Receiver's [Connecticut Uniform Fraudulent Coneyance Act] claims as to the Sarroff Principal Transfers and (ii) his claim for unjust enrichment."

72.      On January 17, 2020, the Receiver filed his Memorandum in Opposition to the Sarroff Defendants' Motion for Summary Judgment. (ECF No. 210.) The Receiver also filed all related papers in further support of such opposition. (ECF Nos. 202-09.)

73.     Early on January 18, 2020, the Sarroff Defendants filed their Memorandum in Opposition to the Receiver's Motion for Summary Judgment. (ECF. No. 217.) They also filed their related papers in further opposition. (ECF Nos. 211-16 & 218.)

74.     The parties then each filed on February 18, 2020, replies to the other side's Memorandum in Opposition.

75.     This Court scheduled oral argument to take place with respect to the motions for summary judgment on July 17, 2020, and then continued such argument to July 30, 2020.

76.     On July 30, 2020, the Court heard oral agument with respect to the cross-motions for summary judgment and then took the matters under advisement.

77.     On September 11, 2020, this Court entered its Ruling and Order on Cross-Motions for Summary Judgment (ECF No. 256), denying both motions for summary judgment.  The Court determined, in summary, that the postions asserted by each movant raised genuine issues of material fact for the trier of fact to determine at trial.

78.     The Court then held a status conference on September 16, 2020, at which time it discussed with counsel a timetable for trial including all related deadlines.

79.     Later that day, this Court entered its Scheduling Order, (ECF No. 259), which, upon the parties' motion, it later modified on September 19, 2020 (ECF No. 262).

80.     The modified Scheduling Order established various deadlines and related matters, and scheduled a jury trial to commence with jury selection on May 10, 2021.

81.     During the Compensation Period, the Receiver's counsel, *inter alia*, coordinated and prepared for Sarroff's counsel's deposition of Michael Meyerhofer, the Chief Operating Officer for Weeden Prime Services, LLC. ("Weeden"). Weeden had maintained the trading accounts in the name of the Relief Defendants and controlled by Sentinel and Varacchi.

**F.  Civil Action Against Ralph Giorgio**

82.     Prior to the Compensation Period, Z&Z attorneys investigated potential causes of action against Ralph Giorgio ("Giorgio").

83.     Giorgio became a manager on the Sentinel platform and was added to Sentinel's

payroll in December 2015. From December 2015 to May 2016, Giorgio received a gross monthly salary of $2,058.34 from Sentinel. In June 2016, at Giorgio's request, Varacchi caused Sentinel to increase Giorgio's gross monthly salary to $20,000. From June 2016 until the collapse of Varacchi's Ponzi scheme, Giorgio received more than $120,000 from Sentinel (the "Giorgio Transfers").

84.     Upon information and belief, Sentinel did not receive reasonably equivalent value in exchange for the Giorgio Transfers. The Giorgio Transfers were not a draw upon incentive-based payments as Giorgio did not manage sufficient assets on the Sentinel platform to justify the amount received. Rather, upon information and belief, the Giorgio Transfers were made with the expectation that the money would be repaid either to Sentinel or Varacchi.

85.     The Receiver prepared a request for leave to commence an action against Giorgio to recover the Giorgio Transfers.  The Receiver also prepared a Complaint against Giorgio seeking such relief.

86.     The Receiver's counsel shared both the motion for leave and the draft Complaint with Giorgio's counsel, and requested that the parties engage in settlement discussions. The Receiver's counsel did not receive any response.

87.     On July 15, 2019, the Receiver filed the Receiver's Motion *On Consent* For Leave To Commence Litigation Against Ralph Giorgio, (ECF No. 119), seeking leave of this Court to commence a civil action against Giorgio. On July 16, 2019, the Court approved the motion and granted the Receiver such leave. (ECF No. 121.)

88.     On October 1, 2019, the Receiver commenced his civil action against Ralph Giorgio, before the United States District Court for the District of Connecticut.

89.     Following the commencement of the action the Receiver engaged in settlement

discussions with Giorgio's counsel. When it became clear that further settlement discussions would not be productive the Receiver demanded that Giorgio's counsel appear and plead in response to the complaint.

90.     Counsel appeared for Giorgio on January 28, 2020, and thereafter moved for an extension of time to respond to the complaint to and including March 11, 2020. The motion for extension of time was granted by order dated February 10, 2020.

91.     In mid-March, 2020, Counsel for Giorgio informed the Receiver's counsel that he was ill and would require an extension of time to respond to the complaint, and to participate in a Rule 26(f) conference for purposes of finalizing a scheduling order.

92.     Thereafter, Giorgio's counsel informed the Receiver's counsel on several different occasions that he remained under quarantine, was suffering from other health problems, and was addressing family related health matters. As a result, the deadline for the parties to meet and confer for purspoes of Rule 26(f) was extended on multiple occasions, with the Receiver's counsel moving for the extensions.

93.     Giorgio did not respond to the complaint. The Receiver's counsel prepared a motion for default and informed Giorgio's counsel, on two separate occasions, that it would be filed absent the filing of a response to the complaint by a date certain. In response, Giorgo's counsel informed the Receiver of his ongoing health problems, family health concerns, and Covid-19 related stay-home orders which caused the closure of his office (Giorgio's counsel is resident in California). Based on Giorgio's counsel's representations and explanation, and the ongoing Covid-19 pandemic, the Receiver did not file a motion for default.

94.     Counsel for the parties met and conferred and filed a proposed scheduling order on June 15, 2020.

95.     A scheduling conference was conducted with Judge Dooley on July 9, 2020, and the parties proposed scheduling order was approved. Giorgio was required to respond to the complaint by August 21, 2020, but did not. Thus, on August 26, 2020, the Receiver filed a motion for default for failure to plead which motion was granted by order dated September 10, 2020. The order granting the motion for default required the Receiver to file a motion for default judgment by October 9, 2020.

96.     Following the entry of default, the parties, through counsel, engaged in settlement discussions and made progress toward settlement.

97.     Accordingly, on October 7, 2020, the Receiver moved for and obtained a 30-day extension, to and including November 10, 2020, to file his motion for default judgement, which the Court granted. (ECF No. 33.) Due to the continuing prospect of reaching a consensual resolution, the Receiver again moved on November 10, 2020, for an additional extension through December 1, 2020, which the Court also granted. (ECF No. 35.)

98.     Unfortunately, the parties could not reach a settlement. Accordingly, on November 30, 2020, the Receiver filed his Motion for Default Judgment against Giorgio, along with his Memorandum of Law in Support of Motion for Default Judgment.  (ECF Nos. 37 & 38.) Giorgio did not respond to the Receiver's Motion for Default Judgment. The motion has not yet been decided by the District Court.

**G.   Investigation of Private Investments**

99.     The Receiver has investigated the Private Investments. The Receiver has researched and analyzed various entities that identified as potentially constituting Private Investments which the Receiver may recover for the benefit of the Receivership Estate.

100.     After reviewing the records of the Receivership Estate, as well as the documents produced pursuant to the Receiver's requests, the Receiver has preliminarily determined that the

investments in Zipway LLC, Gravy, Inc., Invigilio, LLC, and Greenhouse Solutions, Inc. are unlikely to provide any value to the Estate. Comparatively, the Receiver has not yet determined if the value realized by liquidating the Receivership Estate's interests in Kizzang, Entourage, Roots, and StereoCast would justify the costs of doing so.

### H.  Tolling Agreements with Mark J. Varacchi and Jason Rhodes

101.    The Receiver has investigate potential causes of action against Mr. Varacchi and Mr. Rhodes based upon their conduct in orchestrating and operating a Ponzi scheme through Sentinel and the Relief Defendants, and otherwise engaging in actionable conduct. Due to the pending criminal proceedings involving them, the potential need for their testimony in various civil proceedings, and the possibility of a settlement, the Receiver has not yet commenced a civil action against them and has shought to postpone being compelled to do so by applicable statute of limitations.

102.    In order to preserve the *status quo*, the Receiver's counsel approached each of Mr. Varrachi's and Mr. Rhodes' criminal counsel and asked if their respective clients would enter into a Tolling Agreement and Stipulation which would "toll, suspend, and extend the running of any and all applicable statutes and periods of limitations and other time-related claims and/or defenses which he might otherwise be or become entitled to assert." The Receiver counsel proposed a tolling period through July 1, 2020.  Mr. Varacchi and Mr. Rhodes agreed to enter into such agreements.

103.    Effective December 13, 2019, Mr. Varacchi and the Receiver entered into their Tolling Agreement and Stipulation, providing for the tolling of all applicable statutes of limitations through and including July 1, 2020.

104.    Effective December 18, 2019, Mr. Rhodes and the Receiver entered into their Tolling Agreement and Stipulation, providing for the tolling of all applicable statutes of limitations through and including July 1, 2020.

105.    In June, 2020, counsel for the Receiver again approached counsel for each of Mr. Rhodes and Mr. Varacchi and requested that they enter into a second tolling agreement through and including December 1, 2020.  They each agreed.

106.    Each of Mr. Rhodes and Mr. Varacchi thereafter entered into a Second Tolling Agreement and Stipulation made effective June 17, 2020, expressly tolling all application of statutes of limitations and related deadlines through and including December 1, 2020

107.    Once again, in November, 2020, the Receiver's counsel requested that Mr. Rhodes and Mr. Varacchi enter into a Third Tolling Agreement and Stipulation through July 1, 2020.  They each agreed and thereafter entered into the Third Tolling Agreement and Stipulation made effective November 23, 2020, expressly tolling all application of statutes of limitations and related deadlines through and including July 1, 2021.

**I.   Actual and Anticipated Disbursement of Assets**

108.    On October 26, 2020, the Receiver filed his Fourteenth Interim Application for Professional Fees and Expenses Incurred by the Receiver and His Professionals ("Fourteenth Interim Application") (ECF No. 200) for the period from July 1, 2020, through September 30, 2020, requesting that the Receiver and Z&Z be awarded an allowance of $66,472.40 for legal services rendered during the compensation period, and $12,047.92 for the reimbursement of expenses, subject to a 20% holdback applicable to fees for services.

109.    On October 30, 2020, this Court granted the Receiver's Fourteenth Application and Interim Application (ECF No. 202).

110.    Accordingly, on October 30, 2020, the Receiver disbursed $65,225.84 from the Receivership Account to the Receiver and Z&Z on account of the amounts requested in the Fourteenth Interim Application and approved by this Court.

111.    Additionally, the Receiver and Z&Z have incurred fees for their services and Z&Z

has advanced all necessary expenses, which are requested for reimbursement through this Application.

112.   Provided that the Court awards the fees and expenses requested in the pending Twelfth Interim Application and/or this Application, appropriate disbursements, if made, will be reflected on the Receiver's next interim fee application filed after such award.

113.   The Receiver holds cash on hand in the Receivership Account and the Reserve Account. As of December 31, 2020, the balance of the Receivership Accounts is $527,758.06, and the balance of the Reserve Account is $1,125,284.47. Thus, the total cash on hand in the Receivership Account and the Reserve Account is $1,653,042.53.

114.   The Receiver is hopeful that additional funds (in addition to those currently held in the Receivership Account) will be available in the future. Such will depend upon, *inter alia*, the liquidation of additional assets, the resolution or favorable adjudication of the Remaining Disputed Claims, and the successful prosecution of the pending civil litigation and other causes of action held by the Receivership Estate.

**J.   Anticipated Closure**

115.   At this time, it is premature for the Receiver to speculate as to when this Receivership Proceeding will be ready to close.

**IV.   DESCRIPTION OF ASSETS OF THE RECEIVERSHIP ESTATE**

116.   As of the end of the Compensation Period, the following assets are a part of the Receivership Estate:

> a.   The Receivership Account, which is valued at $527,758.06;
>
> b.   The Reserve Account, which is valued at $1,125,284.47;
>
> c.   The Private Investments, which value the Receiver is presently investigating;

and

d.  Any and all causes of action to recover money and possibly other assets for the benefit of the Receivership Estate, which causes of action the Receiver is presently investigating and evaluating, or vigorously pursuing, including, but 7not limited to, the claims against the Sarroff Defendants and Giorgio.

117.  With respect to the Private Investments, the Receiver has identified the following securities:

a.  Kizzang: 3,600,000 Class C shares, 5,400,000 Class D shares, and 1,152,666 Class E evidenced by certificates identifying Varacchi as the owner of such interest;

b.  Greenhouse: 250,000 shares, evidenced by a certificate identifying Varacchi as the owner of such interest; and

c.  StereoCast: 150,000 shares in the name of Varacchi, evidenced by a certificate identifying Varacchi as the owner of such interest.

118.  The Receiver is investigating how best to liquidate and maximize the value of these equity interests in Kizzang, Entourage, Roots, and StereoCast.

## V.  THE COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES

### A.  The Governing Legal Standard

119.  The District Court has the power to appoint a receiver and to award the receiver fees for his services and for expenses incurred by the Receiver in the performance of his duties. *See Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) ("[T]he receiver diligently and successfully discharged the responsibilities placed upon him by the Court and is entitled to reasonable compensation for his efforts."); *see also Securities & Exchange Comm'n v. Elliott*, 953 F. Supp. 1560 (11th Cir. 1992) (receiver is entitled to compensation for faithful performance of his duties.).

120.  The District Court has discretion to determine compensation to be awarded to a

court-appointed equity receiver and his counsel and "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).

121.    The case law and other authority may provide "convenient guidelines," but ultimately "the unique fact situation renders direct reliance on precedent impossible." *Securities & Exchange Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975).

122.    In awarding counsel fees in Securities Act receiverships, "[t]he court will consider ... the complexity of problems faced, the benefit to the receivership estate, the quality of work performed, and the time records presented." *Securities & Exchange Comm'n v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); *see also United States v. Code Prods.*, 362 F.2d 669, 673 (3rd Cir. 1966) (court should consider the time, labor and skill required (but not necessarily expended), the fair value of such time, labor and skill, the degree of activity, the dispatch with which the work is conducted and the result obtained).

123.    While "results are always relevant," a good result may take a form other than a "bare increase in monetary value." *Securities & Exchange Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."). Overall results can be determined only at the conclusion of the Receivership Proceeding.

124.    Another "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them." *Moody*, 374 F. Supp. at 485. Moreover, "[t]ime spent cannot be ignored." *Id.* at 483.

B.  **Application of the Governing Legal Standard to the Application**

125.    Based on the foregoing, the Receiver, Z&Z and K&L respectfully submit that the services for which they seek compensation in this Application were necessary for, and beneficial to, the orderly administration of the Receivership Estate.

126.    As more fully set forth throughout this Application and as detailed in the exhibits submitted herewith, the issues addressed by the Receiver, Z&Z and K&L have been and continue to be highly complex, requiring investigation of an alleged fraud that spanned years, consisted of many poorly-documented transactions and involved numerous investors, Private Investments and financial institutions. The Receiver and Z&Z have made substantial progress in investigating the Receivership Estate's assets and in commencing and prosecuting litigation on behalf of the Receivership Estate.

127.    The Receiver, Z&Z and K&L respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved. The professional services were performed expediently and efficiently. Substantial progress has been accomplished during the Compensation Period and since the Receiver's appointment May 1, 2017.

128.    At the same time, the Receiver and Z&Z have agreed to considerable public service discounts, which exceeded even those generous discounts offered in the Receiver's initial application.

129.    Furthermore, counsel for the Commission has reviewed this Application and has stated that it has no objection to the approval of the professional fees and expenses requested herein.

130.    Accordingly, the Receiver, Z&Z and K&L submit that the compensation requested herein is fair, reasonable and warranted in light of the nature, extent and value of such service to

the Receivership Estate and all parties-in-interest.

### C.  <u>Source and Manner of Payment</u>

131.    The Receivership Estate includes cash held in the Receivership Account. The Receiver, Z&Z and K&L request that the Court enter an order allowing and permitting the approved fees and reimbursed expenses to be paid from the Receivership Account, less the 20% holdback (applicable only to fees incurred by Z&Z). The Receivership Account presently holds sufficient funds to make payment after this Court's approval while maintaining sufficient funds (in his discretion after consultation with the Commission) for various litigation costs such as experts, depositions, transcripts, etc., as well as the ordinary operating costs of the receivership.

**WHEREFORE**, Jed Horwitt, Esq., Receiver, and Zeisler & Zeisler, P.C., counsel to the Receiver, respectfully request that (i) this Application be granted; (ii) the Receiver and Z&Z be awarded an allowance of $19,258.40 for legal services rendered during the Compensation Period, and $7,918.18 for the reimbursement of expenses, subject to a 20% holdback applicable to fees for services, (iii)  K&L be awarded an allowance of $325.00 for services rendered during the Compensation Period and (iv) grant such other and further relief as this Court deems just and proper.

Dated at Bridgeport, Connecticut, this 28th day of January, 2021.

Respectfully submitted,

JED HORWITT, ESQ., RECEIVER


*/s/ Jed Horwitt*
Jed Horwitt, Receiver



By: */s/ Stephen M. Kindseth*
Stephen M. Kindseth (ct14640)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234
Email: skindseth@zeislaw.com
His Attorneys

<u>**CERTIFICATE OF SERVICE**</u>

I, Stephen M. Kindseth, hereby certify that a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System and also at http://jedhorwittreceiver.com/.

*/s/ Stephen M. Kindseth*
Stephen M. Kindseth (ct14640)