# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 3:17-cv-00155-VAB |
| | ) | |
| MARK J. VARACCHI and | ) | |
| SENTINEL GROWTH FUND | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| RADAR ALTERNATIVE FUND LP and | ) | February 28, 2022 |
| RADAR ALTERNATIVE MASTER FUND SPC, | ) | |
| | ) | |
| Relief Defendants. | ) | |

## DECLARATION OF MARK J. VARACCHI

I, Mark J. Varacchi, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. On or about February 1, 2017, I pled guilty to securities fraud, wire fraud, and conspiracy to commit securities and wire fraud all of which arose out of my participation in a fraudulent scheme that I conducted between 2013 and 2016 utilizing Sentinel Growth Fund Management, LLC ("Sentinel"), Radar Alternative Fund LP and Radar Alternative Master Fund SPC.

2. In the fall of 2015 and winter of 2016, Sentinel received a series of transfers totaling $3,750,000 from Advance Entertainment, LLC ("Advance Entertainment"), an entity which was operated and controlled by Joseph Meli ("Meli"). As discussed herein, none of these funds were

1

investments, but were provided to me in an effort to help me conceal my fraud from a Sentinel investor.

3. I was introduced to Meli in or about the spring or early summer of 2014 by John Lomio ("Lomio"), a mutual friend. Lomio told me that Meli was doing some amazing things and I really should meet him.

4. Soon after I met Meli, he pitched having Sentinel make an investment in his enterprise. Meli asked me to cause Sentinel to invest $200,000 to $300,000 in his ticket resale business. Meli told me that the investment would be paid back with fifteen (15%) interest within three to six months.

5. On July 18, 2014, I caused Sentinel to invest $300,000 in Meli's company, 127 Holdings, LLC, by sending a $300,000 wire (the "Sentinel/Meli Investment"). The Sentinel/Meli Investment was repaid on January 15 ($200,000), and 16 ($100,000), 2015. The Sentinel/Meli Investment was repaid later than Meli represented it would be, and was repaid without the promised 15% interest because, as Meli told me, he had substantial funds, but they were tied up in two big projects.

6. I accepted the repayment of the Meli/Sentinel Investment late and without any interest as a favor to Meli.

7. Meli and I knew some of the same people and invested in some of the same closely held businesses. Meli and I were both investors in a company by the name of Stereocast. Meli was a "big deal" to the Sterocast founders who told me that Meli was "flush with cash" and "had $100 million in the bank." As previously mentioned, Lomio also viewed Meli as a really big deal. Based on what I had been told about Meli's wealth, I believed that Meli could be a source of funds for Sentinel if it was ever in need of cash.

8. In the fall of 2015, a Sentinel investor (the "Investor") demanded the return of its $4 million investment, but I did not have the vast majority of the Investor's funds because I had used them to pay other investors and to pay some of my personal expenses.

9. Although I did not have the Investor's funds, in late November 2015 I sent the Investor a doctored brokerage account statement misrepresenting the gross balance to make it appear that all of the Investor's funds were in that brokerage account.

10. The Investor figured out that the account statement had been altered, demanded the immediate return of their $4 million investment, and threatened to go to the Securities and Exchange Commission if I did not immediately return the funds.

11. I was desperate for funds and reached out to Meli because I knew that he had readily available funds and owed me a favor.

12. I told Meli that an investor had demanded the return of $4 million, that I did not have the funds, and that the Investor was threatening to go to the SEC if its funds were not repaid.

13. I told Meli that I needed $3 to $4 million and that I would likely not be able to repay him for years. Meli assured me that he was fine with repayment on my timeline as long as he received a good return, and that the funds would be forthcoming. Meli did not ask any further questions.

14. Meli was slow in getting the funds to me and I was calling him nearly every day to inquire about the timing of the funds and to relay to him the desperate situation that I was in. Meli knew that I was desperate and was growing ever more desperate as time went on; Meli continued to promise me that the funds were on the way.

15. Meli, through Advance Entertainment, wired $1,500,000 to Sentinel on December 29, 2015. Thereafter, between March 1, 2016 and April 15, 2016, Meli, again through Advance Entertainment, wired an additional $2,2250,000 to Sentinel as follows:

   a. March 1, 2016: $300,000;

   b. March 4, 2016: $500,000;

   c. March 16, 2016: $700,000; and

   d. April 15, 2016: $750,000.

16. All of the funds received from Advance Entertainment were received in connection with my December 2015 desperate request for funds to repay the Investor, and I continued to push Meli to get me the funds through the winter and early spring of 2016 because Sentinel was then in need of cash to repay investors whose investments had been used to repay the Investor.

17. In addition to providing funds to repay the Investor, Meli also agreed to assist me in covering up my fraudulent activity.

18. When the Investor informed me that it was aware that the brokerage statement I had provided was doctored, I falsely told the Investor that its funds had been lent out to various individuals and entities, including a company by the name of JTL Construction Corp. ("JTL").

19. Meli agreed to pose as a representative of JTL—an entity with which Meli had no relationship—in a further effort to convince the Investor that its funds had been lent out rather than misappropriated.

20. I introduced a representative of the Investor to Meli by email and invited the Investor to call Meli, in his supposed capacity as a representative of JTL, to discuss the purported repayment of the supposed JTL loan. Meli had agreed to pose as a senior executive of JTL, speak

with the Investor, and confirm my story that Sentinel had made loans to JTL, a company with which Meli had no affiliation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Mark J. Varacchi

Dated: February 28, 2022